Richard L. LYONS, a/k/a Walter Lyons, Appellant,

v.

UNITED STATES, Appellee.

Pamela K. COOPER, Appellant,

v.

UNITED STATES, Appellee.

Nos. 89–CF–250, 89–CF–299.

District of Columbia Court of Appeals.

Reargued Jan. 19, 1995.
Decided Oct. 3, 1996.

W. Gary Kohlman, Washington, DC, with whom Richard T. Brown, was on the supplemental brief, for appellant Lyons. Brenda Grantland, Mill Valley, CA, was on the original brief for appellant Lyons.

Daniel M. Schember, Washington, DC, appointed by the court, for appellant Cooper.

Roy W. McLeese, III, Assistant United States Attorney, with whom Jay B. Stephens, United States Attorney at the time the brief was filed, and John R. Fisher, Terence J. Keeney, and Peter R. Zeidenberg, Assistant United States Attorneys, were on the brief, for appellee.

Before FERREN and TERRY, Associate Judges, and KERN, Senior Judge.

TERRY, Associate Judge.

This opinion is a companion to that of the en banc court in *Lyons v. United States*, 683 A.2d 1066 (D.C.1996), issued today. The full court has held that there is no ground for reversal in the denial of appellants' motion for a mistrial based on a contact between a juror and a police detective who testified briefly at appellants' trial. The remaining issues presented on appeal have been referred by the en banc court to this division. With respect to four of these issues, we reaffirm what we said in *Lyons v. United States*, 683 A.2d 1066 (D.C.1996). As to the one claim of error that has not previously been addressed—appellant Cooper's assertion that the trial court's instructions on the murder charge confused the jury, to her prejudice—we find no merit in it. Accordingly, we vacate one redundant conviction of appellant Cooper, but otherwise we affirm the convictions of both appellants.

## I

The facts of this case are set forth at length in this court's en banc opinion and require only a brief summary here. Appellants operated a cocaine-selling business with Lyons acting as the supplier and Cooper as one of his distributors ("runners"). During the summer of 1985, Lyons solicited a third individual, Daniel Roy, to kill Stephen Royster, another runner in Lyons' narcotics business with whom Lyons had been experiencing difficulties. On February 26, 1986, Roy obtained a pistol from appellant Cooper and mortally wounded Mr. Royster. Shortly after the shooting, Roy returned the pistol to Cooper.[1]

Following a three-week trial, a jury found appellant Lyons guilty of first-degree murder while armed,[2] assault with a dangerous weapon (ADW),[3] and conspiracy to distribute cocaine.[4] Appellant Cooper was found guilty of second-degree murder while armed,[5] ADW, conspiracy to distribute cocaine, and carrying a pistol without a license.[6]

In this opinion we address those issues not decided by the en banc court. We reject appellants' claims of error and, with the one exception noted, affirm their convictions.

## II

Appellants contend that the trial court erred in admitting into evidence the decedent's statement that "T–Bone told them to

---

1. In accordance with a plea bargain, the government agreed to let Roy plead guilty to second-degree murder in return for his full cooperation in the investigation and prosecution of all the other persons involved in the shooting of Stephen Royster.

2. D.C.Code §§ 22–2401 and 22–3202 (1989).

3. D.C.Code § 22–502 (1989).

4. D.C.Code § 33–549 (1988).

5. D.C.Code §§ 22–2403 and 22–3202 (1989).

6. D.C.Code § 22–3204 (1989).

shoot me." [7] The court ruled that the statement was admissible under the spontaneous utterance and dying declaration exceptions to the hearsay rule. This ruling was correct on both grounds.

■ There are three prerequisites to the admission of a statement under the spontaneous utterance exception to the hearsay rule:

(1) the presence of a serious occurrence which causes a state of nervous excitement or physical shock in the declarant, (2) a declaration made within a reasonably short period of time after the occurrence so as to assure that the declarant has not reflected upon his statement or premeditated or constructed it, and (3) the presence of circumstances, which in their totality suggest spontaneity and sincerity of the remark.

*Nicholson v. United States,* 368 A.2d 561, 564 (D.C.1977) (citation omitted). The admissibility of a spontaneous utterance "is committed to the sound judicial discretion of the trial court. We will reverse on appeal only if a ruling is clearly erroneous." *Alston v. United States,* 462 A.2d 1122, 1128 (D.C. 1983) (citations omitted). Appellants claim that Royster's statement about T–Bone was not a spontaneous utterance because Royster "had time to reflect, premeditate, and construct" it. We are satisfied that the statement met all three requirements for admission as a spontaneous utterance.

First of all, the shooting was a "serious occurrence" that produced a state of "physical shock" in Royster. Karen Flaherty testified that when she came to Royster's assistance, he was groaning and in pain. She saw that he had been shot in the chest, and that although the wound "wasn't bleeding a lot outside ... it was a good hole there." This injury plainly fits within the types of situations which this court has recognized as "serious occurrences." *See Gayden v. United States,* 584 A.2d 578, 585 (D.C.1990) (admission of spontaneous utterance upheld when the declarant had been shot six times and was "rolling on a doorstep in extreme pain"),

*cert. denied,* 502 U.S. 843, 112 S.Ct. 137, 116 L.Ed.2d 104 (1991); *Young v. United States,* 391 A.2d 248, 250 (D.C.1978) (declarant had been stabbed and was bleeding profusely); *Nicholson v. United States, supra,* 368 A.2d at 564 (declarant had been stabbed thirty minutes before making statement). Second, Ms. Flaherty stated that no more than ten minutes passed between the firing of the shots and Royster's statement; thus the statement came "within a reasonably short period" after the shooting. *See Alston v. United States, supra,* 462 A.2d at 1127 ("when the utterance is made immediately after the disturbing incident ... or a few minutes after the incident," it fits within the spontaneous utterance exception (citations omitted)). Finally, the circumstances "in their totality suggest spontaneity and sincerity." Contrary to Lyons' assertion, there was no significant interval in which Royster "was fully conscious" and "had time to think and speculate." Rather, the testimony showed that in the short time between being shot and making the statement Royster was in great pain, and that his condition was quickly deteriorating. The fact that Royster made the statement in response to a question from Ms. Flaherty is not proof that he reflected before speaking. *Young v. United States, supra,* 391 A.2d at 250.

■ It also was not erroneous for the trial court to admit the statement under the dying declaration exception to the hearsay rule. "To make out a dying declaration, the declarant must have spoken without hope of recovery and in the shadow of impending death." *Shepard v. United States,* 290 U.S. 96, 99, 54 S.Ct. 22, 23, 78 L.Ed. 196 (1933). The record supports the trial court's conclusion, well founded in the evidence, that Royster realized his "extreme circumstances even though [he did not] articulate" them. *See McFadden v. United States,* 395 A.2d 14, 16 (D.C.1978) ("The court can infer the victim's sense of impending death from the circumstances—from the nature and extent

---

7. "T–Bone" is the nickname of appellant Lyons. The statement was heard by Karen Flaherty, a

woman who worked near the scene of the shoot-

of his wounds").[8]

For these reasons, we find no error in the admission of Royster's statement.

### III

■ Appellants argue that they were substantially prejudiced because the trial judge refused to permit two of the government's witnesses to invoke their Fifth Amendment privilege against self-incrimination. The judge found that both witnesses had waived the privilege by testifying before the grand jury. Appellants acknowledge the rule that a defendant in a criminal proceeding normally does not have standing to assert the constitutional rights of others. *Alderman v. United States,* 394 U.S. 165, 171–176, 89 S.Ct. 961, 965–968, 22 L.Ed.2d 176 (1969). More specifically, a defendant does not have standing to complain of an erroneous ruling on a witness' claim of privilege. *Long v. United States,* 124 U.S.App. D.C. 14, 19, 360 F.2d 829, 834 (1966) (citing *Bowman v. United States,* 350 F.2d 913, 916 (9th Cir.1965) ("Where the witness is not the party, the party may not claim the privilege nor take advantage of an error of the court in overruling it"), *cert. denied,* 383 U.S. 950, 86 S.Ct. 1209, 16 L.Ed.2d 212 (1966)). Appellants argue, however, that this case fits within the exception to this principle announced in *Ellis v. United States,* 135 U.S.App. D.C. 35, 416 F.2d 791 (1969).

■ In *Ellis* the court held:

[A] witness who voluntarily testifies before a grand jury without invoking the privilege against self-incrimination, of which he has been advised, waives the

privilege and may not thereafter claim it when he is called to testify as a witness at the trial on the indictment returned by the grand jury, where the witness is not the defendant, or under indictment.

*Id.* at 44, 416 F.2d at 800; *accord, Salim v. United States,* 480 A.2d 710, 714 (D.C.1984). The *Ellis* court also recognized, however, that when a judge erroneously rejects a witness' claim of privilege, " 'the reasons which underlie our rule denying standing to raise another's rights ... are outweighed by the need to protect ... fundamental rights....' " 135 U.S.App. D.C. at 43, 416 F.2d at 799 (quoting *Barrows v. Jackson,* 346 U.S. 249, 257, 73 S.Ct. 1031, 1035, 97 L.Ed. 1586 (1953)). Thus, contrary to *Alderman* and *Long,* "a defendant adversely affected in fact has standing to bring such departure from the judicial province to the appellate court for review and correction." *Ellis, supra,* 135 U.S.App. D.C. at 44, 416 F.2d at 800.

■ We hold that the *Ellis* exception to the no-standing rule of *Alderman* and *Long* is inapplicable in the instant case because there was no erroneous ruling on the Fifth Amendment waiver issue. The trial judge conducted a lengthy *voir dire* of the two witnesses in question and reviewed their grand jury testimony in order to determine the validity and scope of their waivers.[9] He then made specific findings of fact and ruled that each of them had knowingly and voluntarily waived his privilege. Because that ruling is amply supported by the evidence, we can find no error in the judge's refusal to sustain the witnesses' claim of privilege at trial. The *Ellis* exception therefore does not apply.

---

*ing and came to Royster's assistance after he was shot.*

8. The Supreme Court said in *Shepard, supra,* that the perception of impending death "must be exhibited in the evidence, and not left to conjecture." 290 U.S. at 100, 54 S.Ct. at 24. Of particular relevance on this point was testimony about Royster's own awareness of his condition. When Ms. Flaherty first approached him, a police officer was already on the scene, and they both attempted to move Royster. Flaherty testified, "When we talked to him about moving, he kind of went 'Oh, no,' " and then he groaned. The officer testified that Royster said, "Don't move me. I have been shot too many times."

9. In deciding whether a witness who has testified before the grand jury may later assert a Fifth Amendment privilege at trial, "a proper consideration of all the circumstances require[s] the trial judge to examine the grand jury testimony and to conduct a *voir dire* of the [witness] outside the presence of the jury." *Salim v. United States, supra,* 480 A.2d at 715. "In evaluating the validity of a witness' claim of the Fifth Amendment privilege, the trial court must determine, from all the circumstances, whether the claimant has reasonable cause to apprehend a real danger of prosecution." *Reese v. United States,* 467 A.2d 152, 156–157 (D.C.1983).

## IV

Lyons argues that his Sixth Amendment right to a speedy trial was violated by the fifteen-month delay between his arrest and the start of the trial. He claims that was prejudiced by this delay because someone named "Chester" had died "while the case was pending." Lyons asserts that Chester would have rebutted the testimony of three government witnesses who testified about certain incriminating statements he had made.

 Because the delay was more than a year, the speedy trial claim has *prima facie* merit so as to trigger an inquiry into the other relevant factors: the reasons for the delay, the defendant's assertion of his Sixth Amendment right, and—most important— prejudice to the defense. *See, e.g., Tribble v. United States,* 447 A.2d 766, 768 (D.C.1982). Nine of the fifteen months were consumed by the presentation of the case to the grand jury. This type of "investigative delay" has been characterized as "fundamentally unlike delay undertaken by the government solely to gain tactical advantage over the accused." *Tolliver v. United States,* 378 A.2d 679, 681 (D.C.1977). Moreover, "[a]n immediate ... indictment might impair the prosecutor's ability to continue the investigation or obtain additional indictments...." *Id.* The record plainly shows that this was a difficult and complex case (the trial lasted three weeks and involved twenty-five witnesses), and there is nothing to indicate that the government dragged its feet in conducting the grand jury proceedings. To the contrary, the trial judge stated that before the filing of the indictment he had called upon the prosecutor "to make periodic justifications for that grand jury delay, and I found each time he did so ... that he had demonstrated justification in some sense for the delay." The judge further characterized the delay from indictment to trial as "regrettable," but there is ample authority that such delay, while chargeable to the government, is considered more "neutral" and is "weighted less heavily" against the government. *Barker v. Wingo,* 407 U.S. 514, 531, 92 S.Ct. 2182, 2192, 33 L.Ed.2d 101 (1972).

Lyons was arrested in this case on June 17, 1987, and the next day he was ordered held on a $25,000 surety bond. On June 24 he filed a motion for review of conditions of release in which he "request[ed] a speedy trial" and, in one conclusory sentence, asserted "continuing prejudice to himself and his defense because of his incarceration." After gaining his release on July 21, however, he did not say anything more about a speedy trial until almost a year later, in a motion to dismiss for lack of a speedy trial filed July 15, 1988. The trial judge found it "most telling [that] once Mr. Lyons got out, there were no subsequent assertions [of his Sixth Amendment right] until the eve of trial." [10] He therefore declined to give "strong evidentiary weight" to this factor, and so do we, particularly in light of Lyons' failure to move for a prompt trial as an alternative to dismissal. *See Graves v. United States,* 490 A.2d 1086, 1098–1101 (D.C.1984) (en banc), *cert. denied,* 474 U.S. 1064, 106 S.Ct. 814, 88 L.Ed.2d 788 (1986).

Finally, we can discern no prejudice to the defense resulting from the pre-trial delay. Lyons has not shown how the death of Chester prejudiced his defense, nor can we identify any prejudice from the record. *See Parks v. United States,* 451 A.2d 591, 600 (D.C. 1982), *cert. denied,* 461 U.S. 945, 103 S.Ct. 2123, 77 L.Ed.2d 1303 (1983). There is nothing in the record indicating who Chester was, when he died, or what his testimony would have been. Thus it is unclear whether the pre-trial delay in fact prevented Chester from testifying. There is also no proffer of how Chester would have rebutted the testimony of any government witness. Lyons did not suffer oppressive pre-trial incarceration; he was in jail for only thirty-four days out of the fifteen months between his arrest and the start of the trial. Given the vagueness of his claim of prejudice, the lack of any prejudice revealed by the record, and Lyons' relatively brief confinement, we hold that the trial court did not err in denying his motion to dismiss for lack of a speedy trial.

## V

 Cooper challenges the sufficiency of the evidence to support her murder con-

---

**10.** Appellants' trial began on September 8, 1988.

viction as an aider and abettor. In considering any claim of evidentiary insufficiency, we must view the evidence in the light most favorable to the government, bearing in mind the jury's right to determine the credibility of witnesses and draw reasonable inferences from the evidence. *United States v. Hubbard,* 429 A.2d 1334, 1337–1338 (D.C.) (citing cases), *cert. denied,* 454 U.S. 857, 102 S.Ct. 308, 70 L.Ed.2d 153 (1981); *Byrd v. United States,* 388 A.2d 1225, 1229 (D.C.1978) (citing cases). We recognize no distinction between direct and circumstantial evidence. *Franey v. United States,* 382 A.2d 1019, 1023 (D.C. 1978) (citing cases); *see Holland v. United States,* 348 U.S. 121, 140, 75 S.Ct. 127, 137–138, 99 L.Ed. 150 (1954). Applying these oft-repeated principles to the case at bar, we hold that the evidence was sufficient to prove beyond a reasonable doubt that Cooper was guilty of murder.

■ "One who aids and abets another in committing a criminal offense is chargeable as a principal for all acts committed 'in furtherance of the common purpose, if the act done either is within the scope of that purpose, or is the natural or probable consequence of the act intended.'" *West v. United States,* 499 A.2d 860, 865 (D.C.1985) (citation omitted). "[P]roof of presence at the scene of a crime plus conduct which designedly encourages or facilitates a crime will support an inference of guilty participation in the crime as an aider and abettor." *Jefferson v. United States,* 463 A.2d 681, 683 (D.C. 1983) (citation omitted).

■ The evidence showed that Cooper and Lyons shared a common purpose: to kill Royster in retaliation for stealing cocaine from them and their sellers. In the two months before the shooting, Cooper twice threatened Royster, saying that she would "pay somebody to kill" him and would "shoot [him] now" for having stolen cocaine. Five days before Royster's shooting, Cooper told

Larry Jackson, a friend of Royster, that "we" would shoot Royster if he came back to the North Capitol Street neighborhood. On the day of the shooting, a witness saw Cooper walking along the street, saying to herself that she was "tired of this shit." Minutes later the same witness saw Roy, Cooper, and Lyons together, and he heard Cooper and Lyons arguing with Royster. In Cooper's presence, Lyons said to Royster, "I'm tired of this shit and it's ending now." [11] Roy shot Royster very soon after this argument took place. In the interim, Roy told Derrick Wimple to "go get the pistol," and he saw Wimple receive the gun from Cooper. The jury could reasonably infer that when Cooper handed Wimple the gun, she knew that Roy intended to shoot Royster. With that knowledge, she also took the gun back after Royster had been shot. From all of this evidence—most significantly, from the fact that she furnished the murder weapon to the murderer, *see Smith v. United States,* 665 A.2d 962, 967 n. 9 (D.C.1995)—a jury could readily find that she aided and abetted the murder.

## VI

Finally, Cooper challenges the propriety of the trial court's instructions to the jury on aiding and abetting, as well as its instructions on the vicarious liability of a co-conspirator. We find no error.

■ After first instructing the jury that it could find Cooper guilty as a principal, the court also gave the standard "red book" instruction on aiding and abetting [12] without modification, and without objection from Cooper's counsel.[13] Thus Cooper must now demonstrate plain error in order to win reversal, as she concedes in her brief. *See Allen v. United States,* 495 A.2d 1145, 1151–1152 (D.C.1985) (en banc); *Murchison v. United States,* 486 A.2d 77, 82 (D.C.1984); Super.

11. A reasonable juror could infer, from all the evidence, that what Cooper and Lyons were both "tired of" was the difficulties with Royster. Lyons' statement that "it's ending now" bespeaks an intention to bring the matter to an end; a reasonable juror could infer that the shooting was the planned means of doing so, and that Cooper shared in that plan.

12. CRIMINAL JURY INSTRUCTIONS FOR THE DISTRICT OF COLUMBIA, No. 4.02 (3d ed. 1978).

13. Cooper is represented by different counsel on appeal.

Ct.Crim. R. 30; *see generally Watts v. United States*, 362 A.2d 706, 709 (D.C.1976) (en banc) (defining plain error). She has not done so; indeed, she has not shown any error at all. The aiding and abetting instruction correctly and unambiguously stated the applicable law. *See, e.g., Jefferson v. United States, supra*, 463 A.2d at 683 & n. 5; *Quarles v. United States*, 308 A.2d 773, 775 (D.C.1973). Cooper asks us to "disapprove" what she regards as the "imprecise" phrasing of the standard instruction, asserting that it was ambiguous in this case because the "alleged act of aiding and abetting was itself a crime," namely, possession of a pistol. We decline to do so, for two reasons. First, this argument was not made in the trial court, and thus the court had no opportunity to modify the instruction in a way that might have eliminated any arguable ambiguity. Second, viewing the record as a whole, we see no reasonable likelihood that the jury was in any way confused about the only crime to which the aiding and abetting instruction applied, namely, the murder of Stephen Royster. Appellant Cooper's argument, while novel, is founded entirely on speculation.

 Likewise, we find no basis for reversal in the court's alternative instruction on co-conspirator liability. We need not consider Cooper's challenge to this part of the instructions, even assuming for the sake of argument that the issue is properly before us.[14] The murder charge against Cooper went to the jury on alternative theories, under the court's meticulous instructions, and the verdict form shows that the jury found Cooper guilty on each one separately, first as an aider and abettor and then on the "conspiracy theory." We note, however, that the court imposed on Cooper two separate sentences for murder.[15] "When there is only one killing, the defendant may not be convicted of more than one murder." *Thacker v.*

*United States*, 599 A.2d 52, 63 (D.C.1991) (citation omitted). Thus one of the two murder convictions must be vacated, and under the circumstances we choose to vacate the conviction on the "conspiracy theory" (identified as "Count H" on the judgment and commitment form). Cooper's conviction as an aider and abettor ("Count F") will stand affirmed.

## VII

Appellant Cooper's conviction of murder on a theory of co-conspirator liability (Count H) is vacated. In all other respects the convictions of both appellants are affirmed.

*Affirmed in part, vacated in part.*

---

14. Counsel for Lyons objected to the co-conspirator instruction, but not on the ground now raised by Cooper, and eventually Lyons' counsel agreed to the instruction with modifications virtually identical to those that he proposed. Cooper's counsel did not object at all and did not join in the objection made by Lyons' counsel. Thus the argument now made by Cooper in this court was not made in the trial court by either Cooper or Lyons.

15. We emphasize that the court acted properly in doing so, leaving it for us to decide whether one of the two murder convictions should be vacated. *See Garris v. United States*, 491 A.2d 511, 514–515 (D.C.1985).