**Breond KEYS, Appellant,**

v.

**UNITED STATES, Appellee.**

No. 98–CF–857.

District of Columbia Court of Appeals.

Argued June 20, 2000.

Decided Feb. 22, 2001.

---

William T. Morrison, Silver Spring, MD, appointed by the court, for appellant Breond Keys.

Mark Lesko, Assistant United States Attorney, with whom Wilma A. Lewis, United States Attorney, and John R. Fisher, Roy W. McLeese, III, and Eileen F. Sheehan, Assistant United States Attorneys, were on the brief, for appellee.

Before WAGNER, Chief Judge, and REID and GLICKMAN, Associate Judges.

GLICKMAN, Associate Judge:

Appellant Breond Keys contends that his convictions for first degree burglary, assault and other offenses must be reversed on the principal grounds that the prosecutor elicited perjury from the complainant after the trial court erroneously overruled the complainant's assertion of a Fifth Amendment privilege not to testify. We hold that Keys is not entitled to relief. The prosecutor engaged in no misconduct, and Keys lacks standing to challenge the ruling on the witness's claim of privilege.

### I.

Breond Keys began dating Euell Washington, the complainant, in 1993. Over the next four years, their relationship was a stormy and occasionally violent one, and they ended it in May 1997. According to Washington, Keys continued to harass her after they broke up, to the point that Washington covered the windows of her apartment with blankets and refrained from turning on the lights at night so as not to let Keys know she was at home.

Keys was charged in this case in connection with several incidents, but this appeal concerns one in particular. Shortly after midnight on September 16, 1997, Washington received a visit in her apartment from Eric Newman. Newman, who Washington testified was Keys' best friend, came to warn her that Keys was on his way to her apartment. Moments later, while Newman was still present, Keys kicked in the door and entered the apartment. An altercation ensued, during which Keys beat Washington and knocked her unconscious.

The main factual dispute at trial was over whether Keys used a gun during the break-in. When Washington reported the incident to the police and to friends, she said that Keys pointed a gun at her and threatened to kill her. She repeated this accusation to the grand jury and, ultimately, in her testimony at trial. However, Keys, who admitted that he attacked Washington, denied having a gun. Newman, who was called as a defense witness, supported Keys. He testified that he was present throughout the episode, tried unsuccessfully to protect Washington from Keys, but did not see Keys with a gun or hear Keys threaten to kill Washington. The jury resolved this factual dispute in Keys's favor by convicting him of first degree burglary but not the greater offense of first degree burglary while armed.

The issues we confront in this appeal arose because of a conversation that Washington had with the prosecutor during a lunch break while Washington was in the middle of her direct examination at trial. In that conversation Washington told the prosecutor that she had lied about Keys having a gun so that the police would respond more quickly than they had in the past to her calls for help. Washington said that she had continued to lie about the gun in her testimony before the grand jury and up to trial for fear that she would get in trouble if she admitted the truth. After hearing this recantation, the prosecutor

immediately consulted with a supervisor in the United States Attorney's Office about the correct way to proceed. When court resumed after lunch, the prosecutor promptly informed the judge of Washington's statements. The prosecutor stated that Washington should not resume testifying before receiving advice of counsel, since she might have a Fifth Amendment privilege against self-incrimination if her grand jury testimony was false. The prosecutor added that the government intended to reassess Washington's credibility and decide whether to dismiss any of the charges against Keys, particularly since, she said, Washington had "gone back and forth in terms of her willingness to participate ... [and] her level of memory about the incidents and what she's telling me." Keys's defense counsel agreed that Washington had a Fifth Amendment privilege and needed her own counsel. The court concurred, appointed counsel for Washington, and excused the jury for the day.

Later that afternoon, the parties returned to court along with Eduardo Juarez, Washington's newly appointed attorney. The court was informed that after consulting with Juarez, Washington was now affirming the truth of her grand jury testimony, and was attributing her statements to the prosecutor over lunch to pressure from Keys's mother to say that Keys was unarmed. The prosecutor stated that she and her investigator planned to meet further with Washington and Juarez that afternoon "to have a more in depth discussion" in order to evaluate Washington's credibility.

When court reconvened the following morning, Juarez confirmed that Washington had withdrawn her recantation and that she adhered to her grand jury testimony that Keys had a gun. Nonetheless, Juarez stated, Washington wished to assert her Fifth Amendment privilege against self-incrimination to avoid repeating that testimony at trial. Juarez argued that Washington's testimony about the gun, though truthful and consistent with her prior testimony, could expose her to a perjury prosecution because she might be disbelieved in view of her own contrary statement to the prosecutor during the lunch break and the conflicting testimony of Newman and Keys. After due consideration, the court ruled that Washington's fear of being disbelieved and prosecuted for perjury was not a valid basis on which to honor her invocation of her privilege against self-incrimination. Before it reached that conclusion, however, the court invited the government and Keys to state their positions. Keys's counsel responded that "[w]e take no position." At no time did Keys object to the court's ruling.[1]

Washington thereafter returned to the witness stand. As anticipated, she testified that Keys had a gun when he broke into her apartment and assaulted her. Keys did not object to this testimony, nor did he object when the prosecutor asked questions relating to his use of a gun. Instead, defense counsel impeached Washington with her out-of-court statements that there really was no gun. *See also* 408 Washington admitted that she made those statements—not only to the prosecutor, but also in conversations with defense counsel shortly before trial commenced. Washington also acknowledged that she "went back" to her claim that Keys did have a gun because she was "afraid of being prosecuted for perjury" if she contradicted the testimony she gave in the grand jury.[2] Nonetheless, Washington insisted that she was "[one] hundred percent sure" that Keys did have a gun. She said

---

1.  The prosecutor agreed that Washington had no privilege to refuse to testify truthfully merely because she might be disbelieved.

2.  Washington explained that she felt Keys "wasn't worth me getting taken away from my daughters or my mother because that [sic] I know he did and I tried to say he didn't do it," i.e., she refused to commit perjury and expose herself to prosecution for Keys's sake.

that she made her statements to the contrary only because she was pressured to do so by Keys's family.[3] Washington also testified that she had initially been reluctant to press charges against Keys, and that "she didn't show up in court on the first day [of trial] because they [Keys's mother and others] told me to go out, leave town, to go back to Philadelphia where I was staying." Washington said she came to court the next day only after being convinced that it was the right thing for her to do in order to protect herself.

The defense called Joyce Koon, Keys's mother, to rebut Washington's testimony about why she had temporarily retracted her assertion that Keys was armed. Koon denied telling Washington what to say. She testified that she asked Washington if her son had a gun, and that Washington told her he did not. Koon added that Washington said she told the police there was a gun because she wanted the police "to hurry up and come" when she called them.

## II.

■ Keys argues that he was deprived of his due process right to a fair trial by (1) the trial court's erroneous refusal to uphold Washington's invocation of her Fifth Amendment privilege against self-incrimination, and (2) the government's "negligent or reckless" presentation of Washington's allegedly perjurious testimony that Keys threatened her with a gun. Because Keys did not preserve these claims by making proper objections at trial, they are subject on appeal to review only for "plain error." *See* Super. Ct. Crim. R. 52(b); *Brooks v. United States,* 655 A.2d 844, 847 (D.C.1995). Our rejection of Keys's claims does not, however, turn on the standard of review.[4]

### Washington's Fifth Amendment Privilege

■ Keys's first contention, that the trial court should have upheld Washington's assertion of privilege, is foreclosed by the settled rule that a defendant ordinarily does not have standing to complain of an erroneous ruling on a witness's claim of privilege. *See Lyons v. United States,* 683 A.2d 1080, 1084 (D.C.1996); *Ellis v. United States,* 135 U.S.App.D.C. 35, 42–43, 416 F.2d 791, 799–800 (1969). *See also Alderman v. United States,* 394 U.S. 165, 171–

---

**3.** For example, Washington testified that Keys's mother

> just kept asking me to please not, don't say he had a gun, Euell, please don't say he had a gun so that, you know, he don't get so much time for that. But she says she want him to get time for what he did to me but she just don't want me to say he had a gun.

In a second conversation, according to Washington, Keys's mother and stepfather "both told me the only thing you got to say is he had no gun .... [b]ecause they don't want him to get locked up for it. They don't want him to serve time for it."

**4.** Keys also argues for the first time on appeal that the trial court erred in denying the jury's request during its deliberations to review a police offense report that was not admitted in evidence, but was used solely to refresh the recollection of a police witness about the time of day that he responded to the September 16 incident. The general rule is that "the jury may consider only matter that has been received in evidence," *Carter v. United States,* 138 U.S.App.D.C. 349, 356, 427 F.2d 619, 626

(1970). However, "[i]t is well established that while a writing used to a witness' memory is not ordinarily admissible, it is properly admitted when offered by the opposing party or when the jury on its own motion requests to see it." *Williams v. United States,* 686 A.2d 552, 556 n. 6 (D.C.1996) (quoting *United States v. Smith,* 172 U.S.App.D.C. 297, 309, 521 F.2d 957, 969 (1975)). The trial court has discretion to allow the writing to go to the jury if the court "determines that its inspection would assist the jury in understanding the evidence and would not be prejudicial to the opposing party." *Borel v. Fibreboard Paper Products Corp.,* 493 F.2d 1076, 1103 (5th Cir.1973). In this case the court solicited the views of the parties as to how to respond to the jury's request, and Keys and the government agreed that the report should not be furnished to the jury because it had not been admitted in evidence. There was, moreover, no material issue as to the time that the police were called on September 16. We discern no abuse of discretion on the part of the trial court in acceding to the parties' wishes, let alone plain error.

76, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969). Keys argues that *Ellis* and *Lyons* recognize an exception to this standing rule, to wit that a defendant who is "adversely affected in fact" by an erroneous judicial ruling on a witness's claim of privilege does have standing to challenge that ruling. *Lyons*, 683 A.2d at 1084 (quoting *Ellis*, 135 U.S.App.D.C. at 44, 416 F.2d at 800). Keys contends that he comes within this exception on the theory that if the court had upheld Washington's privilege claim, the government would have had to grant her immunity; and then Washington supposedly would have testified, as she told the prosecutor over the lunch break, that Keys did not possess a weapon when he broke into her apartment on September 16.

■ Keys misconstrues the exception to the no-standing rule that *Ellis* announced and that *Lyons* acknowledged. That exception is more limited than Keys makes it out to be. Under *Ellis*, whether a defendant has standing to challenge an erroneous ruling on another witness's claim of privilege turns not merely on whether the defendant was adversely affected by the ruling, but also on whether the court, in rendering its ruling, exceeded its authority and usurped "a prerogative that Congress has withheld from the courts." *Id.*, 135 U.S.App.D.C. at 41, 416 F.2d at 798. Thus, *Ellis* held that notwithstanding the general rule against standing, a defendant could complain where the trial court chose to compel testimony from a witness whose Fifth Amendment privilege the court recognized as valid—but only because courts lack authority to grant witnesses immunity from prosecution in exchange for their testimony, "since the law enforcement powers are lodged exclusively in the executive" branch. *Id.*, 135 U.S.App.D.C. at 40 n. 9, 416 F.2d at 797 n. 9.

Nor did this court's opinion in *Lyons* expand the narrow *Ellis* exception to the no-standing rule. Keys points to the statements in *Lyons* that "[t]he *Ellis* court also recognized, however, that when a judge erroneously rejects a witness' claim of privilege, the reasons which underlie our rule denying standing to raise another's rights ... are outweighed by the need to protect ... fundamental rights ...." (citations omitted); and that "the *Ellis* exception to the no-standing rule ... is inapplicable in the instant case because there was no erroneous ruling on the Fifth Amendment waiver issue." *Lyons*, 683 A.2d at 1084 (holding that evidence supported trial court's ruling that each witness had knowingly and voluntarily waived his privilege). Taken out of context, these statements might seem to indicate, as Keys contends, that the *Lyons* court conceived the *Ellis* exception to be broader than did the *Ellis* court itself. But that would be a misreading of the opinion. The *Lyons* court undertook to follow *Ellis*, not to enlarge upon it. That the *Lyons* court allowed standing only to challenge judicial usurpation of authority is demonstrated by the specific language with which the court articulated the exception to the no-standing rule. Quoting *Ellis*, the court stated that " 'a defendant adversely affected in fact has standing to bring *such departure from the judicial province* to the appellate court for review and correction.' " *Lyons*, 683 A.2d at 1084 (quoting *Ellis*, 135 U.S.App.D.C. at 44, 416 F.2d at 800) (emphasis added). No broader exception has been recognized. *Accord, Isler v. United States*, 731 A.2d 837, 840 n. 6 (D.C.1999); *Bright v. United States*, 698 A.2d 450, 458 (D.C.1997).

■ Properly understood, the *Ellis* exception is of no benefit to Keys in this case. In requiring Washington to testify, the trial court did not act "outside the scope" of its authority or "usurp a prerogative that Congress has withheld from the courts." *Ellis*, 135 U.S.App.D.C. at 42, 416 F.2d at 798. Rather, the trial court simply evaluated Washington's claim on its merits and ruled that she did not have a valid basis for asserting a Fifth Amendment privilege to refuse to testify. We do not wish to imply that the court erred in so

ruling.[5] But whether or not the court erred, its ruling was within the judicial province. Keys therefore has no standing to challenge that ruling on appeal.

### Prosecutorial Misconduct

■ With his second contention, that the prosecutor improperly presented perjurious testimony from Washington about his use of a gun, Keys evokes the specter of grave prosecutorial misconduct. But that specter is not the reality revealed by the record, which belies Keys's claim that the prosecutor knowingly—or "negligently or recklessly"—presented false evidence. To the contrary, the record establishes affirmatively that the prosecutor acted with caution and rectitude, with candor toward the court and fairness toward Keys and his counsel.

■ Following a line of Supreme Court decisions extending from *Mooney v. Holohan,* 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791 (1935) to *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), this court has held that "[a] prosecutor may not knowingly present false evidence or permit evidence, known to be false, to go uncorrected." *Hawthorne v. United States,* 504 A.2d 580, 589 (D.C.1986).[6] A defendant has a due process right to a new trial if there is "any reasonable likelihood" that evidence known by the government to be false could have affected the jury's verdict. *Id.* at 589–90 (quoting *Giglio,* 405 U.S. at 154, 92 S.Ct.

763). *See generally* Stephen A. Saltzburg, *Perjury and False Testimony: Should the Difference Matter So Much?,* 68 Fordham L.Rev. 1537, 1548–56 (2000). Since the jury acquitted Washington of the armed offense with which he was charged, it might well be questioned whether Keys can establish any reasonable likelihood of prejudice from Washington's testimony that he wielded a gun, let alone the degree of prejudice necessary to entitle him to relief on appeal under a plain error standard of review. We do not reach the question of prejudice, however, for we conclude that Keys has failed to make a showing of any due process violation.

Keys argues that after Washington told the prosecutor during the lunch break that she had lied when she said Keys threatened her with a gun, the prosecutor had a duty to investigate further and to assess Washington's truthfulness. Had the prosecutor conducted a reasonable investigation, Keys argues, she would have learned that Washington had also told defense counsel that there was no gun; that Washington initially said there was a gun so that the police would respond quickly; that she was afraid she would be prosecuted if she changed her story about a gun; and that Eric Newman, who witnessed the September 16 incident, did not see Keys with a weapon. Keys argues that these facts would have given the prosecutor "a concrete, reliable basis for disbelieving" Washington's trial testimony that Keys in

---

**5.** As a general proposition, a witness's invocation of the Fifth Amendment privilege against self-incrimination should be honored if the testimony at issue "would be incriminating and thereby poses the risk of possible future prosecution of the witness." *(George) Carter v. United States,* 684 A.2d 331, 338 (D.C.1996) (en banc). Like the trial court in this case, however, other courts have held that a witness has no Fifth Amendment privilege where the only risk of future prosecution that is identified is that a prosecutor might disbelieve the testimony and prosecute the witness for perjury. *See In re Grand Jury Proceedings (Kopkowski),* 819 F.2d 981, 983 (11th Cir. 1987) (argument that truthful testimony might conflict with testimony of others and there-

fore expose witness to prosecution for perjury "would provide practically all potential grand jury witnesses with a foolproof escape from testifying simply by claiming that the grand jury or a prosecutor might disagree with their version of the truth"); *see also In re Grand Jury Subpoena (McDougal),* 97 F.3d 1090, 1094 (8th Cir.1996); *United States v. Papadakis,* 802 F.2d 618, 621 (2d Cir.1986); *In re Poutre,* 602 F.2d 1004, 1005 (1st Cir.1979).

**6.** We pause to emphasize that all attorneys, not just prosecutors, are ethically obligated not to sponsor evidence known to be false. *See* D.C. Rules of Professional Conduct Rules 3.3(a)(4) and 3.4(b) (1991).

fact did threaten her with a gun. *Hawthorne*, 504 A.2d at 590.

■ We agree with Keys's theory up to a point. The prosecutor in this case did have a responsibility to reassess Washington's credibility in good faith in order to avoid the risk of sponsoring false evidence. *Cf.* D.C. Rules of Professional Conduct R. 3.8(d) (1991), which provides that "[t]he prosecutor in a criminal case shall not . . . [i]ntentionally avoid pursuit of evidence or information because it may damage the prosecution's case or aid the defense." We are satisfied, however, that the prosecutor fulfilled her ethical responsibilities and did not knowingly or recklessly present false testimony. The prosecutor promptly brought Washington's recantation to the attention of the court and the defense. She gave serious consideration to dismissing charges against Keys in light of the apparent change in Washington's story. She used the recess in the trial to meet with Washington and her attorney in order to probe Washington's truthfulness and evaluate her credibility. The prosecutor received Washington's explanation that Keys's family pressured her into saying there was no gun even though there really was one, as Washington had said all along. That explanation was not incredible, and the prosecutor could reasonably believe that Washington was telling the truth when she consistently said from her first reports up until the eve of trial that Keys threatened her with a gun. "Contradictions and changes in a witness's testimony alone do not constitute perjury and do not create an inference, let alone prove, that the prosecution knowingly presented perjured testimony." *Matthews v. United States*, 629 A.2d 1185, 1201 (D.C.1993) (quoting *Tapia v. Tansy*, 926 F.2d 1554, 1563 (10th Cir.1991) (citations omitted)). Although Washington was contradicted by Keys's friend Eric Newman and Keys's mother Joyce Koon, and the jury did not find it proven beyond a reasonable doubt that Keys was armed, Keys has not established that it was necessarily Washington, rather than Newman and Koon, who failed to tell the truth.

■ Thus, we conclude that the prosecutor fulfilled her duties to investigate Washington's credibility and to refrain from presenting testimony known by the government to be false. The prosecutor also fulfilled her duty under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), to disclose Washington's recantation to Keys in a timely manner so that his counsel could use it to impeach her at trial. In the end, the judge and jury, as well as Keys and his counsel, had all the information which Keys argues cast doubt on Washington's truthfulness. Nothing was withheld. We take charges of prosecutorial misconduct in the presentation of perjured testimony with the utmost seriousness. But there was no misconduct, and no violation of due process, in this case. Keys's convictions stand.

*Affirmed.*