Antonio C. JOHNSON, Marcus A. Martin, Appellants,

v.

UNITED STATES, Appellee.

Nos. 06–CF–1119, 06–CF–1314, 06–CO–1593.

District of Columbia Court of Appeals.

Argued March 3, 2009.
Decided April 21, 2011.

Thomas T. Heslep, Washington, DC, for appellant Johnson.

Ian A. Williams, Washington, DC, for appellant Martin.

Suzanne G. Curt, with whom Jeffrey A. Taylor, United States Attorney at the time the brief was filed, and Roy W. McLeese III, Elizabeth Trosman, and Douglas K. Klein, Assistant United States Attorneys, were on the brief, for appellee.

Before WASHINGTON, Chief Judge, and KRAMER and THOMPSON, Associate Judges.

PER CURIAM:

In a five-count indictment, appellant Antonio C. Johnson, appellant Marcus A. Martin, and Robert Eggleston were charged with the following offenses stemming from the July 20, 2004, murder of Joshua Arrington: (1) conspiracy to commit murder, (2) first-degree premeditated murder while armed, (3) possession of a firearm during a crime of violence, (4) carrying a pistol without a license, and (5) obstruction of justice. Johnson was convicted on all five counts and Martin was convicted on all counts except obstruction of justice.[1]

On appeal, Johnson argues the trial court erred—on both evidentiary and confrontation grounds—in admitting the victim Arrington's statements to Officer Ba'th as dying declarations. He also alleges that the trial court erred in failing to sustain objections to the prosecutor's suggestion during closing and rebuttal arguments that Johnson's former girlfriend, Tatum Plater, had repudiated her grand jury testimony because she was afraid of Johnson. Martin argues that admitting the videotape of Plater's statements to the police, in which she relayed statements that Johnson made to her regarding the murder, violated his Sixth Amendment right of confrontation under *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). We find no error and affirm.

## I. Factual Summary

Shortly after 2:00 a.m. on July 20, 2004, Joshua Arrington was shot six times at close range, sustaining gunshot wounds to the chest and rib cage, while sitting in his car. He staggered out of the car and collapsed, at which point a neighbor called 911. Metropolitan Police Department Officer Mikal Ba'th was the first to arrive on the scene. He asked Arrington a series of questions as Arrington lapsed in and out of consciousness, often closing his eyes "as if he wanted to go to sleep, or as if a person was going to sleep." Officer Ba'th sometimes had to repeat his questions. In response to Officer Ba'th's questioning, Arrington stated, *inter alia*, that his name was Joshua; that he had been shot while sitting in the car; that the person who shot him was Antonio Johnson; that Johnson had left the area in a white Marquis; and that Officer Ba'th should contact his grandmother. Arrington died a few hours after getting to the hospital.

On August 1, 2004, Johnson's then-girlfriend Tatum Plater went to the police and gave a video-taped statement. She stated that she came to the police at her brother's suggestion because she didn't feel "safe" with Johnson's "lifestyle." She reported that Johnson "openly told [her] that he was involved with the murder of his best friend, [Arrington]," and that he "beat [her] up, and told [her] he was going to kill [her]." Some of Johnson's statements to her, as related by Plater, implicated Martin.

On August 3, 2004, Plater testified before the grand jury and adopted her video-taped statement. At trial, however, Plater disavowed "everything" she said in her grand jury testimony and the video, stating that she had "made up a story about having information about [the] murder" because she "didn't like the way [Johnson] treated [her] that day" and she wanted to get him "in trouble."[2] Because Plater disavowed her video-taped statement in its

---

1. Eggleston entered into a plea agreement in which he pleaded guilty to obstruction of justice and testified at trial against appellants Johnson and Martin.

2. She told the prosecutor that the tape and grand jury testimony were lies for the first time on April 28, 2006, approximately two weeks before the trial.

entirety, the tape was played for the jury as an inconsistent statement. The tape had been redacted by mutual agreement of the parties to eliminate references to Martin. Appellants' respective counsel lodged no objections to the playing of the tape, though Martin's counsel did request a limiting jury instruction that Plater's statements be used only against Johnson, which the trial court provided.

## II. Dying Declarations and the Confrontation Clause

The trial court admitted Arrington's statements through Officer Ba'th as dying declarations, because there were:

> short bursts of words from the decedent. His eyes were closed as if he was going to sleep.... [H]e was going in and out of consciousness. And the number of wounds that he observed at the time and location of those wounds specifically near the heart, the rib cage of the decedent's body.

Johnson argues that the trial court erred in admitting the statements because (a) they did not fall under the dying declaration hearsay exception, and because (b) their admission violated his Sixth Amendment right of confrontation.

### A. Arrington's Statements Satisfied the Dying Declaration Hearsay Exception

■■■ "To make out a dying declaration, the declarant must have spoken without hope of recovery and in the shadow of impending death." *Lyons v. United States*, 683 A.2d 1080, 1083 (D.C.1996) (quoting *Shepard v. United States*, 290 U.S. 96, 99, 54 S.Ct. 22, 78 L.Ed. 196 (1933)); *see also Bell v. United States*, 801 A.2d 117, 126 (D.C.2002). "The declarant need not utter words acknowledging the certainty of death." *Bell, supra*, 801 A.2d at 126. Rather, "[t]he court can infer the victim's sense of impending death from the

circumstances—from the nature and extent of his wounds." *McFadden v. United States*, 395 A.2d 14, 16 (D.C.1978). That is, a " 'despair of recovery may indeed be gathered from the circumstances if the facts support the inference' " that the decedent was conscious of his impending death. *Jenkins v. United States*, 617 A.2d 529, 531 (D.C.1992) (quoting *Shepard, supra*, 290 U.S. at 100, 54 S.Ct. 22). At the same time, "the perception of impending death 'must be exhibited in the evidence, and not left to conjecture.' " *Lyons, supra*, 683 A.2d at 1084 n. 8 (quoting *Shepard, supra*, 290 U.S. at 100, 54 S.Ct. 22). We accord "great deference to the trial judge's decision relating to 'the preliminary fact question of consciousness of impending death where [it is] reasonably supported by the evidence.' " *Bell, supra*, 801 A.2d at 126 (quoting *Jenkins, supra*, 617 A.2d at 530).

■■ In this case, Arrington was shot six times at close range. One bullet entered through his left chest, passed through his lung, and hit his spinal column. Another bullet entered the left side of his abdomen, piercing his spleen, renal vein, bowel, aorta, right ureter, and kidney. *See Jenkins, supra*, 617 A.2d at 530–31 (holding statements to be dying declarations where the victim "had been stabbed ten times with a double-edged knife, penetrating both lungs, spleen, stomach, arms and back ... was bleeding profusely and staggering before he ultimately collapsed on the pavement" and "repeatedly emphasized that he was in pain"). Arrington opened his car door, took a few steps, and then collapsed, apparently unable to get up. He made the statements in question to Officer Ba'th, the first person to respond to the emergency call, mere minutes after the shooting. When Officer Ba'th first asked Arrington his name, he only moaned. As Officer Ba'th continued to question Arrington

about who had shot him and why, Arrington lapsed in and out of consciousness. He repeatedly closed his eyes "as if he wanted to go to sleep, or as if a person was going to sleep," and died only a few hours after reaching the hospital. *See Butler v. United States*, 614 A.2d 875, 886 (D.C. 1992) (holding statements to be dying declarations where "[a]t the time [the decedent] made the statement, [he] had just been shot, had struggled to his knees, and then had fallen back to the floor .... [and] died a few hours later.").

This evidence strongly supports a conclusion that Arrington was without hope of recovery and realized the gravity of his condition when he made his statements. Indeed, our decision in *Lyons* is practically indistinguishable in this regard. *See* 683 A.2d at 1083–84 n. 8 ("The record support[ed] the trial court's conclusion ... that [the decedent] realized his 'extreme circumstances even though [he did not] articulate' them" where the decedent was groaning in pain and had been shot in the chest, and where, when those on the scene attempted to move him, "he kind of went 'Oh, no' and then he groaned ... [and] said 'Don't move me. I have been shot too many times' "). Accordingly, we perceive no error in admitting those statements as dying declarations.

## B. Admission of Arrington's Statements Did Not Violate the Confrontation Clause

▮ Johnson further argues that, even if Arrington's statements were properly admitted as dying declarations, their admission violated his Sixth Amendment right to confront witnesses under *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). Johnson's argument fails, however, because Arrington's statements were not testimonial and thus are not protected by the Sixth Amendment Confrontation Clause under *Crawford*. "[S]tatements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency." *Davis v. Washington*, 547 U.S. 813, 822, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006). In light of the Supreme Court's recent decision in *Michigan v. Bryant*, —— U.S. ——, 131 S.Ct. 1143, 179 L.Ed.2d 93 (2011), on facts functionally indistinguishable from those in this case, the Sixth Amendment issue is not a close one. *See id.* at 1163–67.

## III. Prosecutorial Comments

Johnson argues that the trial court erred in failing to sustain his counsel's objections to portions of the prosecutor's closing and rebuttal arguments. He contends that there was no evidence to support the prosecutor's suggestion that one reason why Johnson's former girlfriend, Tatum Plater, had repudiated her grand jury testimony was that she was afraid of Johnson. We disagree.

▮ When comments by the prosecutor are allegedly improper, we review to determine whether the trial court abused its discretion or committed legal error by allowing them. *Irick v. United States*, 565 A.2d 26, 33 (D.C.1989). " '[E]vidence concerning a witness' fear tends to be prejudicial because it suggests the witness fears reprisal at the hands of the defendant or his associates if [ ]he testifies.' " *Simpson v. United States*, 877 A.2d 1045, 1048 (D.C. 2005) (quoting *Mercer v. United States*, 724 A.2d 1176, 1184 (D.C.1999)). Such evidence " 'appeals to the passions of the jury and may cause the jury to base its decision on something other than the rule of law.' " *Murray v. United States*, 855 A.2d 1126, 1132 (D.C.2004) (citations omit-

ted). Accordingly, "[a]bsent a factual basis for such a comment by the prosecutor, our case law has been strict in stating that suggestions of fear are forbidden." *Simpson, supra,* 877 A.2d at 1048; *see also, e.g., Gordon v. United States,* 783 A.2d 575, 589–90 (D.C.2001). Indeed, "permissible questioning and argument by prosecutors about witness fear—especially fear of the defendants on trial—must be the limited exception rather than the rule." *Murray, supra,* 855 A.2d at 1133. But, "evidence concerning the fear of a witness ... may be admissible where the witness has given conflicting statements." *Mercer, supra,* 724 A.2d at 1184.

■ Here, Plater made conflicting statements. Moreover, her statements suggested that she would have very good reason to fear Johnson. Thus, the trial court did not abuse its discretion in allowing the prosecutor to comment on her possible fear. Plater adopted her August 1, 2004 video-taped interview in her grand jury testimony on August 3, 2004, but, at trial in May 2006, she specifically testified that "everything" in the video and her grand jury testimony was lies. As a result, the redacted video of her interview with the police was played for the jury, including her explanation for coming to the police because (a) she did not feel "safe" with Johnson's "lifestyle," as Johnson had "openly told [her] that he was involved with the murder of his best friend, [the decedent]," and (b) he had "beat [her] up, and told [her] he was going to kill [her]."

These video-taped statements, admitted without objection by Johnson or Martin,[3] provide a sufficient evidentiary basis from which the prosecutor could suggest that Plater's grand jury testimony was the more credible testimony, and that the inconsistency in her testimony resulted from Johnson's presence in the courtroom.[4] This case is similar to *Simpson v. United States,* where we held that evidence supported the prosecutor's comment that the witness' video-taped "grand jury testimony could be considered more reliable than his testimony at trial [because the comment] was merely a recognition of the possibility that ... confrontation might not produce the more credible testimony." *See* 877 A.2d at 1049. Indeed, "[c]ommon sense tells us that in certain circumstances, face-to-face confrontation between the witness and defendant may have the effect of *inhibiting* the truth from emerging." *Id.* (emphasis in original). In such circumstances, "the comment merely stated the obvious to the jurors and constituted a reasonable inference from the evidence." *Id.* (quoting *Clayborne v. United States,* 751 A.2d 956, 969 (D.C.2000)).

As in *Simpson,* the prosecutor's comment here stated the obvious and constituted a reasonable inference from the evidence. Plater's own prior sworn testimony, entered without objection at trial, provided evidence that Plater felt unsafe around Johnson and that Johnson had previously beaten and threatened to kill her. Accordingly, we reject Johnson's argument that there was no evidence to support the prosecutor's statement.

## IV. Plater's Video Testimony and the Confrontation Clause

■ Martin further argues that the admission of Plater's video-taped statements to police, in which she relayed statements

---

**3.** Counsel for Martin merely requested that the court provide an instruction that the statements that Plater attributes to Johnson in the video are not to be attributed to Martin. That request was granted by the court and acceptable to the prosecution.

**4.** Johnson was not present during Plater's grand jury testimony.

that Johnson made to her regarding the murder, violated his Sixth Amendment right of confrontation under *Bruton.* Martin argues that Plater's description of Johnson's statements, even in redacted form, improperly implicated Martin, who did not have the opportunity to cross-examine Johnson about those statements. As a constitutional matter, Martin's argument fails because Johnson's statements—even assuming imperfect redaction—were not testimonial and thus not subject to the strictures of the Sixth Amendment under *Bruton. See Thomas v. United States,* 978 A.2d 1211, 1219, 1226–27 (D.C.2009).[5] Like those in *Thomas,* these statements were "casual remarks to acquaintances":

> It would be ludicrous to characterize any of the statements as a solemn declaration or as having been made to establish past facts for use in a criminal prosecution or investigation or otherwise. In each instance, the speaker "simply was not acting as a witness; [ ]he was not testifying. What [ ]he said was not 'a weaker substitute for live testimony' at trial."

*Thomas, supra,* 978 A.2d at 1227 (citations omitted). Accordingly, we hold, as in *Thomas,* "that the trial court did not err in concluding that the statements were not testimonial and hence not subject to the strictures of *Crawford* ... and *Bruton.*" *Id.*

■■■■ Nor, assuming he has even preserved the issue, can Martin fairly dispute the admission of Johnson's statements under *Carpenter v. United States,* 430 A.2d 496 (D.C.1981) (en banc), and Super. Ct.Crim. R. 14. "'Rule 14 requires that the trial court take appropriate steps to minimize the prejudice inherent in codefendant confessions which are inadmissible against the nondeclarant defendant.'" *Thomas, supra,* 978 A.2d at 1223 (quoting

*Carpenter, supra,* 430 A.2d at 502). The confession "must be redacted to eliminate all incriminating references to the co-defendant;" "[a] limiting instruction alone is not a sufficient prophylaxis." *Id.* at 1224 (internal quotations and citations omitted). Before playing Plater's video-taped statement for the jury, the trial court ensured that the statement was redacted to Martin's satisfaction. Any explicit reference to Martin was redacted in an artful way so that the redacted statement was not an obvious alteration. The use of the neutral pronoun "we" in portions of Plater's statements did not facially implicate Martin and was therefore not prejudicial, because "we" "[is] indefinite; the term [does] not identify anyone with particularity other than the declarant." *See id.* at 1236 (discussing *Plater v. United States,* 745 A.2d 953, 961 (D.C.2000)). Finally, even assuming the redactions could have been even more complete, substantial evidence of Martin's guilt was presented to the jury, and we are unpersuaded that any shortcomings in the redaction affected the jury's verdict.

*Affirmed.*

---

5. Plater, of course, was available for cross-examination at trial.