Antonio E. BELL, William D. McClain & Charlie Webb, Appellants,

v.

UNITED STATES, Appellee.

Nos. 94–CF–937, 94–CF–794, 94–CF–1480, 95–CO–618, 97–CO–939, 99–CO–1341, 99–CO–1507, 99–CO–1551.

District of Columbia Court of Appeals.

Argued Jan. 24, 2002.

Decided June 27, 2002.

Mark J. Rochon, Washington, DC, for appellant Antonio E. Bell.

Peter H. Meyers, appointed by the court, for appellant William D. McClain.

Billy L. Ponds, Washington, DC, for appellant Charlie Webb.

L. Jackson Thomas II, Assistant United States Attorney, with whom Roscoe C. Howard, Jr., United States Attorney, John R. Fisher, Thomas J. Tourish, Jr., Oscar Mayers, Jr., and John J. Soroka, Assistant United States Attorneys, were on the brief, for appellee.

Before REID and GLICKMAN, Associate Judges, and FERREN, Senior Judge.

FERREN, Senior Judge:

After a 1994 jury trial in this drive-by shooting and hot-pursuit case, appellants Antonio E. Bell, William D. McClain, and Charlie Webb[1] were convicted of first-degree premeditated murder while armed of Richard Tillman, D.C.Code §§ 22–2401, –3202 (1996);[2] assault with intent to kill ("AWIK") while armed of Anthony Irving, D.C.Code §§ 22–501,–3202 (1996);[3] AWIK while armed of Lawrence Hutton; assault with a deadly weapon ("ADW") of Alonzo Smith, D.C.Code § 22–502 (1996);[4]

possession of a firearm during the commission of a crime of violence ("PFCV") (murder of Tillman and related assaults), D.C.Code § 22–3204(b) (1996);[5] ADW of police officer Clarence Douglas, D.C.Code § 22–505(b) (1996);[6] (PFCV) (Officer Douglas); possession of a prohibited weapon ("PPW") (machine gun) (Officer Douglas); D.C.Code § 22–3214(a) (1006);[7] and carrying a pistol without a license ("CPWL") (Officer Douglas), D.C.Code § 22–3204(a) (1996).[8] First, we set out the facts developed at trial. Second, we consider appellants' contentions that the trial court erred in admitting in evidence several hearsay statements under the dying declaration exception to the hearsay rule. Third, we address the out-of-court identifications of appellants (admitted in evidence through the testimony of a police detective), which the witness is claimed to have repudiated at trial. Finally, we evaluate appellants' arguments based on the Jencks Act, 18 U.S.C. § 3500 (1994), and on *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), that the government withheld from them exculpatory evidence. We affirm in part, reverse in part.[9]

Specifically, we conclude that the trial judge erred by improperly admitting Rich-

1. Also named as a defendant in the indictment was Kermit McCray (a.k.a."Denard"), whose trial was severed because of his trial counsel's illness.

2. These provisions have been recodified as D.C.Code §§ 22–2101 and –4502 (2001), respectively.

3. These provisions have been recodified as D.C.Code §§ 22–401 and –4502 (2002), respectively.

4. This provision has been recodified as D.C.Code § 22–402 (2001).

5. This provision has been recodified as D.C.Code § 22–4504(b) (2001).

6. This provision has been recodified as D.C.Code § 22–405(b) (2001).

7. This provision has been recodified as D.C.Code § 22–4514(a) (2001).

8. This provision has been recodified as D.C.Code § 22–4504(a) (2001).

9. Webb also claims trial court error in denying his motion under D.C.Code § 23–110 (2001) alleging ineffective assistance of trial counsel. Our reversal of his convictions moots this contention.

ard Tillman's statements as dying declarations. Because this error pertaining to the site of the murder and related crimes was not harmless, and because no evidence placed Webb and McClain at the site of the assailants' crash after the pursuit by the police where the other crimes occurred, we reverse Webb's and McClain's convictions on all charges, and Bell's convictions for first-degree murder while armed, Bell's two AWIK convictions, Bell's ADW conviction, and Bell's conviction for PFCV as to Tillman and related assaults. We remand for a new trial of all defendants on these charges on which we reverse. However, we affirm Bell's convictions for assault of police officer Clarence Douglas with a dangerous weapon and the related counts for PFCV, PPW, and CPWL.

## I. *The Trial*

The criminal charges were derived from two events: (1) a drive-by shooting of Richard Tillman and others on May 10, 1993, and (2) the high-speed police chase of a station wagon that matched the description of the vehicle involved in the shootings. The parties stipulated that Tillman died on June 24, 1993, from complications that arose from the May 10 gunshot wound. The parties further stipulated that the station wagon pursued by the police bore a temporary license tag in appellant Webb's name, but that the temporary license had not been issued for that vehicle, which belonged to none of the appellants.

The government's evidence showed that Ronald Brewer had been standing at the corner of Florida Avenue and North Capitol Street, N.W., at approximately 8:00 p.m. Brewer saw a brown, four-door Chevrolet station wagon with green, temporary tags approaching from Q Street, turning onto Florida Avenue, and traveling north toward North Capitol Street. Brewer

then heard gunshots and saw three guns pointing out of the passenger side of the car. Because Brewer was frightened and saw everyone in the area running for cover, he could not see how many persons occupied the station wagon. Brewer next saw a man with a shotgun approaching him on the street exclaiming that someone had been hit. Brewer immediately noticed a man injured "in his stomach area" lying on his back in front of a house on Q Street. The police arrived, and Brewer described the events he had just witnessed, including a description of the brown station wagon. Approximately forty-five minutes later, the police brought Brewer to a location on 20th Street, N.E., where he identified the brown station wagon involved in the shooting.

Officer Walker Roach processed the crime scene at the shooting on Q Street. Roach recovered various shell casings, jackets, and bullet fragments from the street and from inside the laundromat. Roach also recovered from another detective the bullet fragments doctors had removed from Anthony Irving.

Lawrence Hutton testified that he had been working inside a laundromat at 10½ Q Street, N.W., when he saw approximately twelve to fourteen "youngsters" standing outside near the telephone. Hutton then heard approximately four gunshots and was shot once himself in the right leg. From his position inside the laundromat, Hutton could not see who fired the shots.

Alonzo Smith was the last civilian witness for the government. Smith testified that he had been on Q Street visiting his friend Tillman. Smith's testimony indicated that shots had been fired at Tillman and others from a station wagon going up Q Street toward Florida Avenue. When the prosecutor asked Smith to describe the procedure the police had used for identify-

ing the assailants, Smith testified that he had picked out only photographs the police had told him to pick. During his testimony there were a number of bench conferences, which demonstrated that Smith was not cooperating in the manner the prosecutor expected. Despite the prosecutor's repeated requests, the trial judge did not allow the government to impeach Smith based on claimed surprise. After Smith eventually acknowledged his prior identifications of the appellants, the trial judge allowed the government's next witness, Metropolitan Police Department (MPD) Detective Lupercio Rivera, to testify as to the substance of Smith's prior identifications.[10] Rivera testified that Smith had identified McClain as the driver of the station wagon involved in the shooting, and that Smith had placed McCray as the front seat passenger, with Webb sitting behind McClain and Bell sitting behind McCray. Rivera added that Smith had identified Bell, McCray, and Webb as the shooters.

Sgt. Arthur Butts testified that on May 17, 1993, in statements at the hospital, Tillman identified the gunmen as "Kermit" (McCray), "Charles" (Webb), "Antonio" (Bell), and "Denard" (William D. McClain). Butts also visited Tillman in the hospital on June 22, 1993, when Tillman nodded only in response to pictures of Bell and Webb.

The prosecution then took up the second, related event. MPD Officers Jerald Brown and Clarence Douglas each testified that on the evening of May 10, 1993, while driving west on Rhode Island Avenue in their respective marked police cars, **they** heard radio broadcasts describing a brown station wagon with several occupants who had just been involved in a shooting in the area of North Capitol Street. Both offi-

cers saw a brown station wagon that matched the broadcast description, with four persons inside, turning onto Rhode Island Avenue from 4th Street. Brown made a U-turn to try to read the vehicle tag number, but the station wagon sped away. Douglas also made a U-turn. Both officers pursued the station wagon through Northeast D.C. as it sped through red lights and traveled on the wrong side of the street. At times exceeding eighty miles per hour, the chase ended after the station wagon turned from Rhode Island onto 20th Street, N.E. There, the driver lost control, plowing through cement steps into a house near Eastern Avenue.

Douglas testified that his cruiser—in front of Brown's car throughout the pursuit—pulled back a little from the station wagon once it turned onto 20th Street because that was a residential area. As a result, Douglas did not actually witness the crash into the house. When he came to the crash scene, Douglas observed both rear doors of the station wagon fly open and saw two men heading into a walkway between two houses while the two other occupants were still in the car. Douglas further testified that he then saw two muzzle flashes coming from the passenger side of the car. Douglas could not see the faces of any of the men because it was growing dark.

Brown testified that he had seen three of the four occupants leaving the vehicle, two from the front door of the passenger side and one from the rear door on the passenger side. According to Brown, the occupant who left from the rear door fired five or six gunshots in Douglas's direction. Brown did not see the gun, but he did see the muzzle flashes. Brown further testi-

---

10. Anthony Irving, another witness who was shot on Q Street, refused to testify, and the trial judge accordingly held him in contempt.

fied that, after he had seen the shooting, he drove down an alley to cut off the suspects running from the car. Brown recognized one of the runners, who was wearing a blue shirt, as the man who had fired at Douglas. Shortly thereafter, Officer Samuel Naylor—who had seen a blue shirt in the alley—found Bell, dressed in an undershirt and a pair of blue shorts, hiding in a window well. Brown then identified Bell as the man who had shot at Douglas.[11]

During a canvass of the crash crime scene, Brown testified that he observed "a 9 millimeter ["9mm"] pistol . . . [lying] in between the two houses, in the walkway where the two suspects ran," and a blue shirt was found that was identified as the shirt Bell was wearing and had discarded after he fired on Douglas. Brown also testified that the "Tech 9" (AP 9mm) was "recovered inside the vehicle." Brown further identified a number of photographs that depicted alternative views of the crash scene and the physical evidence he observed—the blue shirt and the two weapons recovered at the scene. He identified the photograph of the 9mm pistol as the pistol that was found lying between the two houses. He also identified the picture of the AP 9mm recovered from the front seat of the vehicle. During cross-examination, the defense impeached Brown with the fact that his statement—provided within two hours of the incident—had not mentioned that someone had shot at Douglas, or that Brown had seen muzzle flashes.

Officer Tira Gibson, a crime scene search officer, testified that prior to collecting the evidence found at the crash scene, she took photographs of the evidence. Gibson identified two handguns—one as an automatic weapon (found partially hidden under the front seat of the station wagon)[12] and a semi-automatic weapon[13] (recovered from the walkway)—as the weapons recovered at the crash scene. Gibson also testified that the AP 9mm, semi-automatic pistol with a twenty shot magazine (loaded with nineteen rounds of ammunition) and expended shell casings had been recovered from the front seat and the rear floorboard. Further, corroborating Brown's testimony, Gibson indicated that a loaded, operable, semi-automatic Smith & Wesson 9mm pistol was found lying on the walkway between two houses.

During cross-examination, Gibson testified that she had "thoroughly searched" the station wagon, but could not recall whether she had looked under a newspaper found on the rear floorboard. Gibson testified that she found only the AP 9mm in the vehicle. Gibson also testified that ultimately she had handed the evidence to Mobile Crime Technician Connie Hickman. Gibson described where she recovered the shell casings from the vehicle, and Officer Timothy Curtis, the firearms expert, testified as to the specific attributes of the shell casings.

On March 3, 1994, approximately ten months after the crime, Officer William Adamson conducted a second search of the station wagon impounded at the Mobile Crime Laboratory's garage. The prosecutor had procured a search warrant after noticing in a photograph a bulge on one of the car doors that might be holding an unrecovered bullet slug. The windows of the station wagon had been left open and

---

11. The police also apprehended Kermit McCray, whom Brown identified as one of the men he had seen fleeing from the station wagon.

12. In his testimony, the firearms expert, Officer Timothy Curtis described this gun as the semi-automatic AP 9mm.

13. Curtis described this gun as a 9mm Smith & Wesson pistol.

the vehicle thus exposed to the elements. Adamson recovered a red plastic cup, a green beer bottle, key ring with keys, four expended shell casings (two 9mm and two .32 caliber), and a rusted .32 caliber Colt pistol under a newspaper in the back seat.

Officer Curtis indicated that the AP 9 model 9mm, the Smith & Wesson 9mm, and the rusted Colt pistol were fully operable. He indicated that the rusted .32 caliber handgun recovered during the second search was consistent with the ballistic evidence recovered at the Q Street crime scene. His testimony further indicated that three of the shell casings found inside the station wagon had been fired from the 9mm Smith & Wesson pistol found outside the car and in the flight path where appellant Bell had been arrested.

Detective Dale Daily testified that, after appellant Bell's arrest, Bell had provided a written statement indicating that he had been a passenger sleeping in the station wagon; that he had awakened when he heard gunfire; and that he never had fired a gun on May 10, 1993. Detective William Hennessey testified that appellant McClain, after voluntarily surrendering to the police, had remarked that "Flintstone" (Tillman's nickname) deserved to die because he had raped someone's mother and because he had killed someone.

## II. *The Dying Declarations*

We begin with appellants' argument that the trial court erred in admitting into evidence, as dying declarations by Tillman, certain out-of-court identifications attributed to him by Sgt. Butts. At a pretrial hearing, Butts testified that when he had visited Tillman at the intensive care unit of the Washington Hospital Center on May 17, 1993, Tillman had told him that he had been the victim of a drive-by shooting in front of a laundromat at 10½ Q Street.

Tillman communicated that the young men who did this were "Kermit" (McCray), "Charles" (Webb), "Antonio" (Bell), and "Denard" (McClain).[14] When Butts showed Tillman six photographs, five of which were of these individuals, Tillman picked out Bell, McClain and Webb.

Butts also visited Tillman in the intensive care unit on June 22, 1993—just two days before Tillman died. Butts showed Tillman the same six photos, but Tillman nodded only in response to those of Bell and Webb. Tillman also communicated to Butts that four guns had been fired from a burgundy car, but that nobody had shot back at it. Tillman communicated that the four men had shot him "because they were jealous of him." Butts's testimony also revealed that while at Q Street after having been shot and upon arriving at the hospital, Tillman provided the police with a false name, address, and social security number. At the time of the shooting, Tillman was on escape status from a juvenile facility.

On April 12, 1994, the trial court held a hearing to determine the admissibility of the statements made by Tillman to Butts. Dr. Bikram Paul, the MedStar critical care physician at Washington Hospital Center, testified that Tillman had come to the Shock Trauma Unit on May 10, 1993, but that he had been admitted initially under the name of "Kevin Buchanan." At that time, Tillman was in shock attributable to massive fluid loss and profuse bleeding from his wounds in the groin area and from arteries which the bullet struck. Doctors prepared Tillman for immediate surgery in an attempt to save his life. Tillman displayed symptoms of adult respiratory distress from the beginning of the surgery. Although his lung functions never really improved, Tillman's heart func-

---

**14.** Kermit McCray also was known as "Denard."

tions and blood pressure were "very nicely stabilized." When Tillman stabilized initially, the medical staff thought he had a ten percent chance of survival. Throughout his hospitalization, Tillman had a number of tubes and wires protruding from his body, including a tracheotomy and breathing tube.

Dr. Paul further testified that Tillman's condition had taken a downturn around the sixth or seventh day of his hospitalization, when his adult respiratory distress syndrome set in. Upon the onset of the respiratory distress, Tillman's chance of survival was less than one percent. As a result of his gradual deterioration, the medical staff lost hope that any procedure would keep Tillman alive and, after consulting with his family, instituted varying degrees of "do not resuscitate" orders three or four days before he died. By June 23, 1993, Tillman was suffering from respiratory failure because of his inability to excrete carbon dioxide.

Dr. Paul's testimony indicated that he had no recollection of any discussion with Tillman about his prognosis for survival. Although Tillman was told that his condition was critical, Dr. Paul did not recall anyone telling Tillman that he almost definitely was going to die. Dr. Paul also testified that, with young patients such as Tillman, "[i]f they survive [the initial trauma] and are not doing well, for ethical reasons I do not tell them they are going to die." Dr. Paul added that, while he sometimes informed Tillman when things "didn't look good," he tempered that information with encouragement so that the young patient did not "just give up and so [he tried] to help us."

Patricia Hawkins, a registered nurse who had attended to Tillman in the intensive care unit, testified that when she saw Tillman communicating with his family they were discussing "[m]ostly things in general, people he would talk to, or things that he would do once he was discharged or things that were going on at home." Hawkins further testified that these conversations had to have taken place within the last two weeks of his care, because that was when Tillman was more communicative. Hawkins acknowledged that Tillman's family did most of the talking, and that Tillman either nodded or shook his head in agreement or disagreement. Although Tillman could not speak normally, he communicated by moving his lips or by removing his breathing tube temporarily and trying to speak. Hawkins had no recollection of anyone telling Tillman he was dying. Hawkins added that whenever she was with Tillman while his family was there, "[t]hey were calm, more positive . . . they were informing [him] of what was going on at home with the family, with friends."

Hawkins also testified that she had been present during one of Tillman's visits from the police. Although she could not recall the precise date, she testified that it was "near the end of his stay." Hawkins testified that during the interview Tillman "was calm" and "didn't show a lot of emotion in his face, he just did what he was asked and then the interview was over."

At the conclusion of the hearing, the judge credited the testimony of all the witnesses and concluded in part:

> Throughout [the hospitalization], he's frail, weak, thin, unable to move and he has a tube in his throat. So, the medical condition from May 10th to June 24th, I will find he is in a shadow of real impending death; that when he was shot, he was already marked for death because of his condition, that never fully improved.

In then finding that Tillman's statement during his second interview on June 22 was admissible as a dying declaration, the

judge said, "I think it's reasonable to infer that he knows he's in some serious, critical condition." The judge also found with regard both to May 17 and to June 22 that

> even though he's not told he's going to die and the knowledge that he's going to die is not—specific knowledge that he's going to die or specific evidence that he knows he's going to die is not really what's required.
>
> Certainly, combining his injury, his condition, what he's told about his condition in terms of it being critical and what he can observe when he's conscious, *I think it would be reasonable to infer that Mr. Tillman knows he's in critical condition and that he could die.* [Emphasis added.]

After crediting some of the testimony focusing on Tillman's plans after he left the hospital, the judge stated: "I don't think that ... defeats the inference that I've made that *he knows he's in critical condition and could die,* since these statements could have been made at some earlier points." [ (Emphasis added.) ] With regard to the reliability of Tillman's identifications, the judge ruled that the "[Herculean] effort" which Tillman put forth to communicate with Butts satisfied her that the identifications were reliable. The judge summarized:

> There is a presumption that's acceptable to the Court. Here you've got medical interventions artificially keeping him alive, and he couldn't live without the interventions. And we're talking about a one percent chance of surviving when the police are talking to him the first time, and the second time they know he's not going to survive. All of the systems have failed and all the interventions have failed. Now, looking at McFadden,[15] that there is a—you pre-

sume that he knows he's going to die because he [McFadden] is told his condition is serious, and he's in pain, and at various times they see tears in his eyes and, you know, there's this jerking or bucking with the respirator at one point when he's shown the picture. I would say [McFadden's situation] is comparable to [Tillman] going to such efforts of voluntarily putting himself in stress, taking this tube, the respirator in and out in order to try to communicate, that that's certainly the equivalent of tears in the eyes and bucking his respirator.

> ... I mean there's a lot of presumptions that are built into this, and a lot of them have to do with the serious injury that is tied and you presume based on that, and the pain and the rest of this connected to it, that—and the life-threatening condition which I found. So, there is some basis for making this presumption that the person knows [he is dying].

The judge added that Tillman "would be alert enough and conscious enough, from the testimony, to make his own observations about the tubes, the respirator, the pain and the fact that he has a life—that he would have a life-threatening condition." The judge then concluded that the identifications were reliable because of the effort with which Tillman had made them, and ruled that the identifications would be admitted in evidence as dying declaration exceptions to the hearsay rule.

■ The dying declaration exception to the rule against admission of hearsay is "based on the belief that persons making such statements are highly unlikely to lie." *Idaho v. Wright,* 497 U.S. 805, 820, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990). "The sense of impending death is presumed to remove all temptation to falsehood, and to enforce as strict an adherence to the truth

15. *McFadden v. United States,* 395 A.2d 14 (D.C.1978).

as would the obligation of oath." *Id.* (quoting *Mattox v. United States*, 156 U.S. 237, 244, 15 S.Ct. 337, 39 L.Ed. 409 (1895)). This court has held that "[t]o make out a dying declaration, the declarant must have spoken without hope of recovery and in the shadow of impending death." *Lyons v. United States*, 683 A.2d 1080, 1083 (D.C. 1996) (quoting *Shepard v. United States*, 290 U.S. 96, 99, 54 S.Ct. 22, 78 L.Ed. 196 (1933)). The declarant need not utter words acknowledging the certainty of death. *McFadden v. United States*, 395 A.2d 14, 16 (D.C.1978) ("The court can infer the victim's sense of impending death from the circumstances—from the nature and extent of his wounds.").

■■ This court accords great deference to the trial judge's decision relating to "the preliminary fact question of consciousness of impending death where reasonably supported by the evidence." *Jenkins v. United States*, 617 A.2d 529, 530 (D.C.1992) (internal quotations and citations omitted). But "the perception of impending death 'must be exhibited in the evidence, and not left to conjecture.'" *Lyons*, 683 A.2d at 1084 n. 8 (quoting *Shepard*, 290 U.S. at 100, 54 S.Ct. 22). While the decision to admit or exclude testimony lies within the discretion of the trial judge, the exercise of that discretion must "be founded upon correct legal principles." *In re J.D.C.*, 594 A.2d 70, 75 (D.C.1991) (citing *Conrad v. Medina*, 47 A.2d 562, 565 (D.C.1946)). It is an abuse of discretion if the trial judge rests her "conclusions on incorrect legal standards." *Id.* (citing *Jett v. Sunderman*, 840 F.2d 1487, 1496 (9th Cir.1988)). Given this standard of review, we must conclude that the trial judge erred in admitting Tillman's identifications.

■■ In the first place, it appears that the trial court—by finding that Tillman knew he was in "critical condition" and "could die," rather than knowing he was "without hope of recovery," *Lyons*, 683 A.2d at 1083—applied the wrong test; legal error on this issue is evident for that reason alone. But even if the trial court were understood to have viewed the evidence under the correct formulation, the record—as a matter of law—does not support the trial court's hearsay ruling.

In *Jenkins*, the circumstances supporting the inference of the declarant's knowledge of impending death showed that he "had been stabbed ten times with a double-edged knife, penetrating both lungs, spleen, stomach, arms and back. In addition, he was bleeding profusely and staggering before he ultimately collapsed on the pavement [and never regained consciousness]." 617 A.2d at 530. In *McFadden*, although the declarant never was told his death was imminent, his knowledge to that effect could be inferred because he had been severely burned all over his body; incisions had been made to ease the tremendous swelling; he frequently lifted the blankets and saw his charred body; he became extremely fearful and panicky and asked for help; he "bucked" the respirator and tried to breathe alone; and tears filled his eyes when he viewed the suspect's photograph. 395 A.2d at 15–16.

■ Here, in contrast, the record does not support the inference that Tillman sensed his own impending death. The mere fact that Tillman understood he was in serious condition and could die is not a sufficient basis for allowing the admission of the identifications under the dying declaration exception. *See, e.g., Lyons*, 683 A.2d at 1083 (quoting *Shepard*, 290 U.S. at 99, 54 S.Ct. 22 ("the declarant must have spoken without hope of recovery and in the shadow of impending death")). Only a declarant's state of mind, not physical condition per se, is relevant in satisfying the requirements of the dying

declaration exception. The fact that one knows he or she might die, compared to knowing with certainty that one is dying, does not satisfy the traditional rationale for the exception: that "[n]o person, who is immediately going into the presence of his Maker, will do so with a lie upon his lips." *Idaho v. Wright,* 497 U.S. at 820, 110 S.Ct. 3139 (quoting *Queen v. Osman,* 15 Cox Crim. Cas. 1, 3 (Eng. N. Wales Cir. 1881)).

Moreover, the judge's conclusion that Tillman's *ability* to see his condition implied that he knew of his impending demise is, legally, too long a stretch. Although the trial judge related Tillman's condition to that of the declarants in *McFadden* and *Jenkins,* the present case is readily distinguishable on the facts. In *Jenkins,* the declarant was bleeding profusely immediately after being stabbed in multiple organs, and managed to utter a few words before collapsing and never again regaining consciousness. 617 A.2d at 530. In *McFadden,* the declarant could see almost all of his body charred, swollen and cut open. 395 A.2d at 16. In this case, however, the record does not indicate whether Tillman could see the wounds around his groin area; given that his ability to see straight down his body was impaired by breathing tubes. Even assuming he could see his wounds, there is no basis beyond "conjecture," *Shepard,* 290 U.S. at 100, 54 S.Ct. 22, to conclude that the swelling and wounds suggested to Tillman that assuredly he would die. Furthermore, the mere fact that Tillman had tubes and wires protruding from his body—a condition common to many patients who survive—is not enough for an

inference that Tillman knew he was dying.[16]

On May 17, 1993, the date of Butts' first interview, the evidence suggests that Tillman was seriously ill, but there is no evidence that anyone had appraised him of a probability of death or that he was resigned to that likelihood. The medical staff, while not deluding him, consistently offered Tillman encouragement so that he would not give up hope. As well, his family remained positive around him and engaged him in discussions about what he would do once he left the hospital. By June 22, 1993, when Butts interviewed Tillman again, there was a significant deterioration in Tillman's health. But neither the medical staff nor his family appears to have informed him that it had become just a matter of time until death. Nurse Hawkins testified that Tillman was communicative that day and that the interview with Butts was as good as it could have been, given Tillman's inability to communicate easily. In sum, the admission of Tillman's photo identifications, through Butts, as dying declarations premised on a sense of impending death lacks support in the record, and the trial judge erred in admitting this evidence. *In re J.D.C.,* 594 A.2d at 77.

### III. *Alonzo Smith's Previous Identifications of Appellants*

Appellants attack the trial court's admission of MPD Detective Lupercio Rivera's testimony that Alonzo Smith had each appellant, and the respective roles of each, as a participant in the shooting of Tillman on Q Street. Specifically, relying on *In re L.D.O.,* 400 A.2d 1055, 1057 (D.C.1979);

---

16. Although not directly relevant to Tillman's perceptions of his impending death on either May 17 or June 22, 1993, it is noteworthy that upon his arrival at the hospital on May 10, 1993, while in shock with a massive gunshot wound to his groin area and hemorrhaging from major arteries, Tillman was probably closer to death than at any other time until he died on June 24, 1993. In that state, he had the presence of mind to provide to authorities a false name, address, and social security number.

*Fletcher v. United States*, 524 A.2d 40, 43 (D.C.1987),[17] they contend that such hearsay identification evidence is inadmissible as substantive evidence because Smith destroyed the predicate for admissibility when he "repeatedly indicated that he only selected the photographs of appellants after police officers told him whom to select, and what [the suspects] had allegedly done." Furthermore, appellants argue that to "permit introduction of an out of court identification, as substantive evidence, in the face of an outright denial by the witness that such an identification ever took place, would improperly extend the Supreme Court's ruling in *United States v. Owens*, 484 U.S. 554, 108 S.Ct. 838, 98 L.Ed.2d 951 (1988), and overrule *Fletcher* and *L.D.O.*"

The government contends that the trial court properly admitted the identification testimony as substantive evidence because the declarant was available for cross-examination at trial, and that under D.C.Code § 14–102(b)(3) (2001)[18]—a statutory provision which admittedly post-dated the trial in this case—the introduction of the prior identification would be allowed as substantive evidence should a new trial be granted. The government further argues that, even if § 14–102(b)(3) is inapplicable, the Supreme Court's *Owens* decision substantially undermined *L.D.O.* and *Fletcher* to the point that we can ignore their evidentiary constraints.

Because—even with Rivera's testimony in evidence—all Q Street convictions must be reversed because of harmful trial court error in the admission of Tillman's dying declarations, we need not address the respective arguments here, as elaborated below.

## IV. Dispositions of all Q Street Convictions

■ Without the identifications attributable to Tillman (by Butts), the jury was left—as to McClain and Webb on Q Street—with only Rivera's testimony ascribing identifications to Smith. Smith himself, however, declined to make in-court identifications and admitted only pretrial identifications coerced by the police. We cannot say, absent the Tillman identifications as corroboration, that the jury would have found Rivera's testimony more plausible than Smith's. In short, without Tillman's testimony in evidence, we cannot say assuredly enough—within the meaning of *Kotteakos v. United States*, 328 U.S. 750, 765, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)—that the jury would have relied on Smith and other evidence to convict McClain and Webb for the Q Street crimes. The error in admitting Tillman's identifications as dying declarations, therefore, was not harmless as to McClain and Webb.

■ The harmless error analysis as to Bell is more complicated, however, because Bell admitted in writing that he had been

**17.** *See also Scales v. United States*, 687 A.2d 927, 931 (D.C.1996).

**18.** D.C.Code § 14–102 (2001), effective in May 1995, provides:
(a) The credibility of a witness may be attacked by any party, including the party calling the witness.
(b) A statement is not hearsay if the declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement and the statement is (1) inconsistent with the declarant's testimony, and was given under oath subject to the penalty of perjury at trial, hearing, or other proceedings, or in a deposition, or (2) consistent with the declarant's testimony and is offered to rebut an express or implied charge against the witness of recent fabrication or improper influence or motive, or (3) an identification of a person made after perceiving the person. Such prior statements are substantive evidence.

in the station wagon at the crash site, which others had identified as the source of the Q Street shootings. The evidence showed no hiatus between the Q Street crimes, the police pursuit, and the crash. The evidence, therefore—without the Tillman and Smith identifications—appeared to be sufficient, we may assume, for convicting Bell of those Q Street crimes. Mere sufficiency of the evidence, however, does not dictate a finding of harmless error. Here, the jury heard statements attributable not only to Tillman (by Butts) but also to Smith (by Rivera), identifying Bell on Q Street, including an identification attributed to Smith describing Bell as a shooter from a passenger seat in the station wagon. On the other hand, for the reasons explained above as to McClain and Webb, we cannot say that the jury—absent Tillman's corroborating testimony—would have believed Rivera's report of Smith's identification testimony that Smith, himself, repudiated. Furthermore, we cannot say that the jury, without credible eyewitness identification from Q Street, would have convicted Bell for the crimes there based on his presence at the crash site coupled with a written statement admitting only that he had been in the car asleep, awakened by gunshots, none of which he fired. We cannot conclude, therefore, that the jury would have convicted Bell of the Q Street crimes on the evidence uninfected by the trial court error, within the meaning of *Kotteakos.*

Accordingly, we must reverse the murder, AWIK, and weapons convictions not only of Webb and McClain, but also of Bell, derived from the Q Street shootings. We now turn to the convictions for crimes at the assailants' crash site after the police pursuit.

## V. *The Jencks Act and Brady Issues*

After trial, appellants learned that, before trial was underway, the MPD had been conducting an administrative investigation and disciplinary proceeding into Officer Gibson and her partner, Officer Anderson, focusing on the manner in which they had processed the crash scene on 20th Street. Specifically, the MPD had inquired as to whether Gibson carelessly had overlooked the rusted gun later found in the station wagon, and whether she had mislabeled other evidence. Appellants accordingly filed motions under D.C.Code § 23–110 (2001) to vacate sentence based on newly discovered evidence. Appellants claimed that the government intentionally had suppressed sworn exculpatory statements—Jencks statements by Gibson, made during the disciplinary proceeding—which the government could have disclosed before the verdict but withheld.[19]

Attached to the motion were several documents that appellants claimed the prosecutor should have disclosed at trial pursuant either to the Jencks Act, 18 U.S.C. § 3500 (1994) (requiring production at trial of any "statement" by a witness, called by the prosecution, that relates to the subject matter of the witness's direct testimony) or to *Brady v. Maryland,* 373

---

19. The relevant time-line is as follows:
    May 10, 1993—The shooting incident
    January 25, 1994—First scheduled trial date
    February 25, 1994—Second search of the vehicle
    March 14, 1994—Disciplinary action initiated
    March 18, 1994—Sgt. Tate allegedly informs the prosecutor of investigation

    March 22, 1994—Statements of Officers Adamson, Hickman, Anderson and Gibson in administrative investigation
    April 5, 1994—Trial commences
    April 8, 1994—Gibson's testimony at trial
    April 20, 1994—Gibson placed on probation one year; verdict returned.

U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) (Fifth Amendment due process requires government, upon defendant's request, to disclose in time for trial any evidence in its possession both favorable to defendant and material to guilt or punishment).

Among the sworn statements previously undisclosed was one by Gibson on March 22, 1994, in which she revealed to an MPD investigator that, from the time the police had arrived at the 20th Street location until the crime scene investigation began, an hour had passed as a result of a jurisdictional dispute between the Mobile Crime Lab Unit and the 5th District Crime Scene Search Unit. In addition, Gibson attempted to explain why the MPD had found shells and a handgun in the brown station wagon ten months later on the second search:

> Almost anything could have contributed to the evidence surfacing. . . . I am human and sometimes humans do err. I would take full responsibility for the allegations brought forth in the complaint if there weren't any discrepancies. However, there are many. Was a gun overlooked in the auto at the crime scene? Did at least two Crime Scene Search Officers and possibly others overlook a gun in the auto? Certainly a gun was found in the auto almost a year later but was it always in the auto? The vehicle was not sealed at any time in my presence or anytime thereafter. Therefore the auto was accessible to anyone even though it may have been stored on a police facility. . . . *Did someone store the gun in [the] auto after it was towed for storage and simply forgot it was there? Did someone put the gun in the auto after it was towed and maybe others prevented him/her from retrieving it such as sickness, incarceration or even death?* One thing is clear. Thirteen pieces of evidence were recovered from the scene. Clearly, there were concerted efforts made to retrieve all evidence connected with the case. [Emphasis added.]

Gibson further acknowledged that her initial item descriptions from her investigation had been erroneous, and that she had not completed new forms correcting them, which would explain the discrepancies between the evidence reports she prepared and Hickman's evidence reports from the 20th Street crime scene. Gibson explained that she thought Hickman had rectified the discrepancies by initialing Hickman's correct descriptions on the evidence bags. The discrepancies in Gibson's and Hickman's reports related only to the shell casings, not at all to the other evidence.

Under questioning by the investigating officer, Sergeant Yvette Tate, about the newspaper in the station wagon where the rusted gun later had been found, Gibson answered:

> Tate: Did you observe [on May 10, 1993] any newspaper in the car? If so where was it located?
>
> Gibson: I recall seeing newspaper but I don't remember where.
>
> Tate: When did you observe the newspaper? Was it after your photos were printed?
>
> Gibson: Yes.
>
> Tate: Did you look underneath the newspaper?
>
> Gibson: I don't remember seeing the newspaper until after I saw the photos.
>
> Tate: Was there evidence underneath the newspaper?
>
> Gibson: I can't recall. [handwritten: "No I did not see any newspaper."] [initialed "TG"].

The transcript also indicates that a union representative, Marcello Muzzati, noted on behalf of Gibson: "[W]e object to this

statement due to the fact that we were willing to waive the 45 day rule in order not to create additional [J]en[c]ks material."

The motions judge found no Jencks Act or *Brady* violations, although he did find that "Gibson's failure to make known her disciplinary statements was intentional and that this act of bad faith must be imputed to the government."

Because all evidence from Gibson's disciplinary proceeding will be available at a retrial, *Jones v. United States,* 719 A.2d 92 (D.C.1998), any possible *Brady* or Jencks Act violation is relevant only to Bell's ADW (Douglas) and related weapons convictions derived from the crash scene, and thus we review this issue only as it relates to these charges.

The record makes clear that none of these Bell convictions was dependent to any meaningful extent on Gibson's trial testimony, and that none would have been undermined appreciably by impeachment derived from her disciplinary proceeding. The only evidence of the assault on Officer Douglas (and related weapons offenses) was the testimony of Officers Douglas and Brown. Specifically, Brown and Douglas pursued a station wagon until it crashed; Brown identified Bell as the blue-shirted suspect from that vehicle, at the crash site, who fired what appeared to be a gun at Douglas; like Brown, Douglas saw the muzzle flashes; Bell himself admitted that he'd been in the vehicle at the crash site; Brown saw Bell fleeing from the station wagon; crime scene officers, including but not limited to Gibson, retrieved a 9mm Smith & Wesson pistol from Bell's flight path—the gun that Brown described; Brown also identified photographs of the crash scene and the 9mm Smith & Wesson pistol found there; a ballistic expert testified that this pistol was operable; and the

record reflects that Bell had no license to carry a pistol.

Accordingly, Gibson's statements at trial—even if stricken—or at her disciplinary proceeding—even if produced—would not have affected the outcome in a way that triggers *Brady* or Jencks Act sanctions. Specifically, as to the convictions that arise from the assault on Douglas, the failure to disclose Gibson's disciplinary proceeding in full was not so serious that there would have been a "reasonable probability that the suppressed evidence would have produced a different verdict." *Strickler v. Greene,* 527 U.S. 263, 281, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999) (applying *Brady* ); *accord Johnson v. United States,* 537 A.2d 555, 559–60 (D.C.1988). Nor is there a "reasonable likelihood" that disclosure would have "had a significant effect on the outcome of the trial or produced a different result." *Moore v. United States,* 657 A.2d 1148, 1152 (D.C.1995) (applying The Jencks Act).

■ It is important to note, finally, that even though the motions judge found that the government had acted in bad faith by intentionally withholding the very fact of Gibson's disciplinary proceeding from the jury, that evidentiary omission at most had legal relevance to the "planted gun" theory of the defense. That theory—because it concerned only a rusted .32 caliber pistol found inside the station wagon—was entirely unrelated to the crash site convictions based on the 9mm Smith & Wesson. And, in any event, *Brady* is not used to punish the government for conduct that would not, with "reasonable probability," affect the outcome. *See Johnson,* 537 A.2d at 559–60. Nor did the withheld fact of the disciplinary proceeding, combined with the government's bad faith, comprise, without more, a "statement" subject to Jencks Act sanctions. 18 U.S.C. § 3500(e); *see also Hilliard v. United*

*States,* 638 A.2d 698, 704–05 (D.C.1994) ("foundational requirement[]" for production under Jencks Act is that "material constitute a 'statement' ").

For the foregoing reasons, we affirm Bell's ADW conviction (Officer Douglas) and the related counts for PFCV, PPW, and CPWL at the crash site. However, we reverse Webb's and McClain's convictions on all charges, and reverse Bell's convictions for first-degree murder while armed, Bell's two AWIK convictions, the ADW conviction, and Bell's conviction for PFCV as to Tillman and the related assaults. We remand this case for a new trial of all defendants on all charges on which we reverse.

*So ordered.*