Bruce E. MARSHALL, Appellant,

v.

UNITED STATES, Appellee.

Nos. 08–CF–1372, 08–CF–1373.

District of Columbia Court of Appeals.

Argued March 11, 2011.

Decided March 24, 2011.

demonstrate that the ALJ applied the correct standard of proof.

700

Lisa D. Chanel, appointed by the court, for appellant.

James Klein, Samia Fam, and Sloan S.J. Johnston, Public Defender Service, filed a brief on behalf of appellant.

John P. Gidez, Assistant United States Attorney, with whom Ronald C. Machen Jr., United States Attorney, and Elizabeth Trosman, Chrisellen R. Kolb, and T. Patrick Martin, Assistant United States Attorneys, were on the brief, for appellee.

Before REID and FISHER, Associate Judges, and KRAVITZ, Associate Judge, Superior Court of the District of Columbia.*

KRAVITZ, Associate Judge:

A Superior Court jury found appellant Bruce E. Marshall guilty of aggravated assault while armed, mayhem while armed, and related offenses arising from the shooting of Kevin Green on March 26, 2007. On appeal, appellant contends that the trial court erred by admitting the trial

* Sitting by designation pursuant to D.C.Code § 11–707(a) (2001).

testimony of (1) two government witnesses who were present in the courtroom during a pretrial detention hearing in the case and (2) a government witness who appellant claims did not make a knowing waiver of her Fifth Amendment privilege against compelled self-incrimination. Appellant also contends that the trial court committed plain error by allowing the government to proceed at trial on an obstruction of justice charge on a factual theory materially at variance with a proffer the government made before trial in response to appellant's motion for a bill of particulars.

We reject all of appellant's contentions of error. We accordingly affirm the judgment of the Superior Court, with the exception of a limited remand necessitated by the merger of appellant's convictions on two counts of possession of a firearm during a crime of violence.

## I.

At approximately 10:15 a.m. on March 26, 2007, Metropolitan Police Department Officer Charles Johnson responded to a report of a shooting inside Amanuel Market, a small grocery store located at 3661 Georgia Avenue, N.W. Upon his arrival, Johnson observed blood seeping out of the market beneath its front door. Johnson entered the market and found Kevin Green lying on the floor suffering from a gunshot wound to the face. Crime scene officers later recovered two .9 mm shell casings and an expended bullet from inside the market. Green was unarmed.

Expert testimony presented at trial established that a bullet entered Green's head through his face and severed his left carotid artery. Green's injuries caused him to suffer a severe stroke, which paralyzed nearly the entire right side of his body and rendered him unlikely ever to be able to speak normally again. Green did not testify at trial.

Detective Jed Worrell took charge of the investigation shortly after police first arrived at the market. Within hours of the shooting, Worrell obtained surveillance footage from the market's four indoor video cameras and from an outdoor police video camera mounted on a pole at a nearby intersection.

The indoor video footage showed a man wearing a North Face jacket enter the market. The man stopped briefly at the cashier's booth near the front of the market and then walked to the rear of the store. Green then entered the market and approached the cashier's booth. The man in the North Face jacket soon returned to the front section of the market and stood facing Green. Green placed his left hand on the cashier's booth but moments later fell to the floor. The man in the North Face jacket then ran past Green's prone body and out of the market.

The outdoor video footage from the same time period showed the man in the North Face jacket get out of a dark-colored car parked nearby on Rock Creek Church Road, N.W. and walk toward the market. Less than three minutes later, the same man ran back toward the car, turned around and looked in the direction of the market, and got in the car and drove away.

The next day, March 27, 2007, Worrell canvassed the neighborhood in search of the car shown in the outdoor surveillance video. Several blocks east of the market, the detective found a dark blue 1989 Mercury Grand Marquis parked in the 3600 block of Park Place, N.W. The car looked just like the one in the video, and it had two parking tickets on its windshield, one issued in the afternoon of March 26, 2007, the other early in the morning of March 27, 2007. The detective determined that

the car was registered to a man named Mario Tyrell.

Worrell interviewed Tyrell on April 2 or 3, 2007 and showed him several still photographs taken from the video surveillance footage. Tyrell identified the Grand Marquis as his former car and stated that the first man shown entering the market looked like his cousin, Bruce Marshall (appellant), who was about the same size, had similar facial features, and wore a North Face jacket like the one in the photographs. At trial, Tyrell testified that he sold the Grand Marquis to appellant three or four days before the shooting. He also told the jury that appellant called him on the morning of March 27, 2007 and said that the car had been stolen two days earlier, on March 25, 2007. Following Tyrell's meeting with Worrell on April 2 or 3, 2007, Tyrell called appellant and told him that the police had shown him some video footage and asked him questions about appellant and the Grand Marquis. During a subsequent search of the car's interior, police recovered two documents bearing appellant's name.

Lakiya White was appellant's girlfriend on and off for two and a half years preceding the Amanuel Market shooting. White testified that appellant asked her to purchase a gun for him several months before the shooting. At the time, appellant explained to White that he was unable to buy a gun himself because he was not a United States citizen. White agreed to appellant's request, and in late July 2006 she and appellant went to a gun shop in Silver Spring, Maryland. Appellant picked out a .9 mm semi-automatic pistol and then waited outside the shop while White filled out the paperwork necessary to purchase the gun in her own name. White and appellant returned to the shop in early August 2006 to pick up the gun, which White immediately gave to appellant. A few weeks later, at appellant's instruction, White falsely reported to the police that the gun had been stolen. White subsequently accompanied appellant to a shooting range in Upper Marlboro, Maryland, where appellant practiced firing the gun at paper targets.

Appellant called White during the last week of March 2007 and asked if he could come see her. White agreed, even though she and appellant were not romantically involved with each other at the time. Appellant soon arrived at White's apartment in Prince Georges County, Maryland, wearing a North Face jacket and carrying two suitcases full of clothing. Appellant asked White if he could stay with her, explaining that his sister, with whom he had been staying, had sold her house. Appellant also said he was planning to go to Jamaica for a couple of months. White told appellant that he could stay with her temporarily, and appellant moved into her apartment. On two occasions in the first week of April 2007, White accompanied appellant to Baltimore Washington International Airport, where appellant tried, without success, to purchase an airplane ticket to Jamaica.

Shortly thereafter, White saw one of the surveillance videos of the Amanuel Market shooting on the website of a local news station. White testified at trial that she could clearly see appellant's face on the video. White was horrified by the video, and she called Crime Solvers and identified appellant to the police as the shooter.

Worrell learned on April 17, 2007 that appellant was staying with White. Police arrested appellant later that day at White's apartment and seized a North Face jacket during a search of the premises.

Brittany Perkins was dating appellant at the time of the shooting. Perkins told the jury that on the morning of March 26, 2007

appellant drove her to school in a big, midnight-blue car that appellant had recently purchased from his cousin. Appellant and Perkins made plans to meet at appellant's house that afternoon, but appellant never showed up. Perkins called appellant repeatedly over the course of the following week, but appellant did not answer or return any of her calls.

Perkins finally had contact with appellant a week or two later. Appellant told Perkins that he needed to see her, and they met at a hotel, where appellant acknowledged that he "shot the boy" and that he had been staying with White. Appellant asked Perkins to go to his house and to rip up the registration certificate for his car. Appellant gave Perkins the key to his bedroom, and Perkins went to appellant's home, found the registration certificate, and tore it up.

Perkins also testified that appellant regularly carried a gun. On New Year's Day 2007, appellant fired the gun up in the air as he and Perkins walked through an alley. Shell casings were ejected from the gun when it was fired, and appellant gave one of the shell casings to Perkins. Perkins kept the shell casing, and in March 2008 she gave it to Worrell. A firearms examiner testified at trial that the two shell casings recovered from Amanuel Market on the day of the shooting were ejected from the same gun as the shell casing Perkins gave to the police a year later. The gun itself was never found by the police, and the expended bullet recovered from Amanuel Market was too mutilated for scientific comparison.

In March 2008, Perkins also gave Worrell an extensive set of letters she had received from appellant since his arrest in April 2007. As discussed in greater detail below, a portion of one of the letters was admitted in evidence at trial.

Appellant testified in his own defense at trial. He told the jury that he met Green several years earlier and that their relationship was cordial until the summer of 2006, when Green wrongly accused him and a friend of breaking into Green's car. Appellant told Green that he had nothing to do with the break-in, but over the next several months Green set appellant's car on fire, repeatedly threatened to kill appellant, and shot appellant's friend. Appellant was so concerned about Green's threats that he obtained a gun with White's help and began to carry it for protection. When appellant saw Green inside Amanuel Market on March 26, 2007, he noticed that Green had his hand on his waistband, and he feared that Green had a weapon and would shoot him. Appellant testified that he fired first in self-defense and then ran from the market.

The jury returned a verdict on June 25, 2008 following a week-long trial. The jury found appellant guilty of aggravated assault while armed, mayhem while armed, possession of a firearm during a crime of violence (aggravated assault while armed), possession of a firearm during a crime of violence (mayhem while armed), carrying a pistol without a license, possession of an unregistered firearm, unlawful possession of ammunition, tampering with physical evidence, and obstruction of justice. The jury acquitted appellant of assault with intent to kill while armed and a third count of possession of a firearm during a crime of violence.

At sentencing on September 12, 2008, the trial court imposed a total of sixteen years in prison. This timely appeal followed.

## II.

### A. Rule on Witnesses

■ Appellant moved during trial to exclude the testimony of Lakiya White and

Brittany Perkins as a sanction for a violation of the rule on witnesses. Appellant asserted that White and Perkins were present in the courtroom during a pretrial hearing at which Detective Worrell testified about the case, and he argued that the prosecutor representing the government at the pretrial hearing should have recognized White and Perkins as government witnesses and taken steps to keep them out of the courtroom.

In response to appellant's motion, the trial court held a mid-trial hearing outside the presence of the jury to determine whether White and Perkins were in fact present during any pretrial hearings in the case and, if so, whether either had been exposed to testimony or other evidence or information related to her own testimony. Neither witness was able to remember the date of any hearing she attended, but the evidence strongly suggested that both witnesses were present inside the courtroom during a preventive detention hearing held on April 27, 2007.

White told the judge that she attended a pretrial hearing sometime after she met with detectives and prosecutors about the case and testified before the grand jury. White generally recalled that Worrell testified at the pretrial hearing about the shooting in the market and about several items the detective subsequently recovered from her house. White was unable to remember anything more specific about Worrell's testimony, however, and she did not believe she was the focus of any of the evidence presented at the pretrial hearing.

Perkins told the judge that she too attended a pretrial hearing at which Worrell testified. Perkins met with Worrell before the hearing and answered his questions concerning her whereabouts on the day of the shooting and a blue car allegedly involved in the crime. Perkins stated that although she was later present in the courtroom while Worrell testified, she did not hear the detective mention anything she had told him during their meeting.

The record reflects that the preventive detention hearing held on April 27, 2007 was the only pretrial hearing in the case at which any testimony was presented. Worrell was the lone witness who testified at that hearing.

The trial court found no violation of the rule on witnesses and denied appellant's request to exclude the testimony of White and Perkins. The judge, who had presided over the preventive detention hearing, stated that he had no recollection of anyone invoking the rule on witnesses at the hearing. He also found no basis to believe that White and Perkins attended the detention hearing for the purpose of conforming their testimony to that of other witnesses and no reason to conclude that the prosecutor who handled the detention hearing for the government was familiar with White and Perkins or understood that either or both might testify at trial.

Appellant contends that the trial court committed reversible error by failing to exclude the trial testimony of White and Perkins. In the alternative, appellant argues that the trial court should have proceeded against White and Perkins for contempt and permitted the parties to comment to the jury on the witnesses' violation of the rule on witnesses. We find no error.

The rule on witnesses is "deeply engrained in the common law" even though it is not codified in the District of Columbia. *Benn v. United States*, 801 A.2d 132, 140 (D.C.2002). Under the rule, a trial court, acting on its own or at the request of a party, has broad discretion to take steps aimed at preventing the intentional or unintentional distortion of testimony by, for example, requiring witnesses to remain

outside the courtroom except when they are testifying, directing witnesses not to communicate with each other about the substance of their testimony, and prohibiting the parties and counsel from sharing information about one witness' testimony with another witness. *See* 6 WIGMORE, EVIDENCE § 1840 at 471 n. 7 (4th ed. 1976). The purpose of such limitations is "to encourage truthful and independent testimony by lessening the chance that a witness will be subtly and even subconsciously influenced by listening to what others say, and by removing temptations or opportunities for witnesses to deliberately shape their testimony in light of what others say." CHRISTOPHER B. MUELLER & LAIRD C. KIRKPATRICK, FEDERAL EVIDENCE § 339 at 557 (2d ed. 1994) (discussing Rule 615 of the Federal Rules of Evidence, which codifies the rule on witnesses for the federal courts). As the Supreme Court stated in *Geders v. United States*, 425 U.S. 80, 87, 96 S.Ct. 1330, 47 L.Ed.2d 592 (1976) (citations omitted), the rule on witnesses "exercises a restraint on witnesses 'tailoring' their testimony to that of earlier witnesses[,] and it aids in detecting testimony that is less than candid."

■ The rule on witnesses, however, is not self-executing. The federal courts have consistently interpreted Rule 615 of the Federal Rules of Evidence to require a party to request the sequestration of witnesses "in order to claim any protection" from the rule, MUELLER & KIRKPATRICK, *supra*, § 339 at 558, and at common law the applicability of the rule has always been dependent on a decision of the trial judge to invoke the rule in a particular case, *see* WIGMORE, *supra*, § 1839 at 467 (describing the sequestration of witnesses under the rule as either "demandable as of right" or "grantable only in the trial court's discretion"); *Benn*, 801 A.2d at 140 (stating that the rule "is rooted in *a trial*

*judge's* broad authority to control trial proceedings in general and to sequester witnesses in particular") (emphasis added). Particularly in a busy urban court system like ours, in which trial courtrooms are often filled with people unfamiliar to the presiding judge, the parties are in a far superior position to know whether anyone present in the courtroom is a potential witness in the case and to bring the issue to the judge's attention. Indeed, only through the entry of an order invoking the rule on witnesses can a trial judge exercise his or her discretion to set the specific contours of the rule as necessary to effectuate its purpose in light of the circumstances presented in a particular case. The rule on witnesses thus is in effect only if the trial court, acting on its own or at the request of a party, has affirmatively invoked the rule.

■ It is axiomatic that a party appealing an adverse judgment to this court bears the burden of presenting an appellate record sufficient to establish the occurrence of error below. *Cobb v. Standard Drug Co.*, 453 A.2d 110, 111 (D.C. 1982). To establish a violation of the rule on witnesses, therefore, appellant must present record evidence that the trial court invoked the rule at or before the preventive detention hearing on April 27, 2007 and that White and Perkins were present in the courtroom during the hearing in violation of the trial court's order.

Appellant has failed to meet his burden. The transcript of the preventive detention hearing confirms the trial judge's recollection that there was no mention of the rule on witnesses at the hearing, and nothing else in the record before us suggests that the trial court ever invoked the rule prior to or during Worrell's testimony. We conclude, accordingly, that the rule on witnesses was not in effect during the detention hearing on April 27, 2007 and that the

presence of White and Perkins in the courtroom during the hearing was not a violation of the rule. The trial court thus correctly determined at trial that the rule on witnesses did not provide a proper basis on which to exclude the testimony of White or Perkins or to impose any other sanction against either witness or the government.

In any event, the record reveals that White and Perkins were exposed to very little testimony at the preventive detention hearing. The trial court permitted Worrell to adopt a nine-page, single-spaced, typed arrest warrant affidavit as part of his testimony at the hearing. No one read the affidavit aloud in the courtroom, and the detective subsequently answered only a limited number of follow-up questions posed by the prosecutor and by counsel for appellant. Appellant has failed to identify a single instance in which the trial testimony of either White or Perkins was affected by the witness' presence at the detention hearing, and we are aware of none.

Moreover, nothing in the record establishes that White and Perkins were present in the courtroom on April 27, 2007 as part of a coordinated effort to subvert the fairness of the proceeding or the reliability of its outcome. *Cf. Brown v. United States,* 388 A.2d 451, 456 (D.C.1978) ("[A] witness' testimony will be excluded *only* where the violation of the court order was with the connivance or knowledge of the party or his counsel.") (internal quotation marks omitted). In fact, the transcript of the detention hearing suggests that at least one of the two witnesses (it is not clear which one) was present at the hearing to show support for appellant, with the knowledge of appellant and his counsel. In requesting appellant's pretrial release, appellant's counsel stated: "[Appellant] has strong ties to the area. He lives with his grandmother and grandfather in a very

secure residential setting. His family is here today. His sister is here. *His fiancée is here in the courtroom.*" (emphasis added).

## B. Privilege

■ Appellant also moved during trial to exclude Perkins as a witness on the ground that Perkins' testimony concerning her own involvement in the destruction of appellant's car registration certificate would be self-incriminatory as to the offense of tampering with evidence. Appellant asserted that the prospect of testifying at trial made Perkins very uncomfortable notwithstanding her waiver in the grand jury of her Fifth Amendment privilege against self-incrimination.

The trial court denied appellant's motion. The court had already found on the record at the beginning of trial that Perkins was "informed of her Fifth Amendment right against self-incrimination" and "made a knowing, voluntary waiver of her constitutional rights" in the grand jury. The court ruled that Perkins accordingly had no privilege to avoid testifying at trial.

Appellant contends that this ruling was reversible error. We disagree.

■ It is a "settled rule that a defendant ordinarily does not have standing to complain of an erroneous ruling on a witness's claim of privilege." *Keys v. United States,* 767 A.2d 255, 259 (D.C.2001) (citing *Lyons v. United States,* 683 A.2d 1080, 1084 (D.C.1996); *Ellis v. United States,* 416 F.2d 791, 799–800 (D.C.Cir.1969)). A party may challenge such a ruling only if the party is adversely affected by it and only if "the court, in rendering its ruling, exceeded its authority and usurped 'a prerogative that Congress has withheld from the courts,'" for example, by granting a witness immunity in a circumstance in which the authority to do so is "'lodged

exclusively in the executive' branch." *Keys,* 767 A.2d at 260 (quoting *Ellis,* 416 F.2d at 798 & 797 n. 9); *see also Lyons,* 683 A.2d at 1084. Because this limited exception to the settled rule is clearly inapplicable here, we conclude that appellant lacked standing in the trial court to assert any Fifth Amendment rights on Perkins' behalf and that he similarly lacks standing on appeal to challenge the trial court's determination that Perkins' waiver of her Fifth Amendment privilege in the grand jury operated as a waiver of the same privilege at trial.

■ Even if we were to reach the merits of appellant's challenge, we would readily conclude that appellant has failed to establish error. Appellant has not provided us with the transcript of Perkins' grand jury testimony or otherwise presented any basis in the record to determine that the trial court's finding of a knowing and voluntary waiver in the grand jury was erroneous. *Cf. Cobb,* 453 A.2d at 111. And as the trial court recognized, it has long been the law in the District of Columbia that "a witness who voluntarily testifies before a grand jury without invoking the privilege against self-incrimination, of which [she] has been advised, waives the privilege and may not thereafter claim it when [she] is called to testify as a witness at the trial on the indictment returned by the grand jury, where the witness is not the defendant, or under indictment" herself. *Ellis,* 416 F.2d at 800.

### C. Variance

■ The indictment charged obstruction of justice by broadly tracking the language of the relevant provisions of the obstruction of justice statute: "On or about April 17, 2007, to on or about March 3, 2008, within the District of Columbia, Bruce E. Marshall, willfully and knowingly threatened, corruptly persuaded, and by threatening letter and communication, endeavored to influence, intimidate and impede Brittany Perkins, a witness in an official proceeding, to wit, the case of *United States v. Bruce Marshall,* Criminal Case Number 2007CF308859, then pending in the Superior Court of the District of Columbia, with the intent to influence, delay, and prevent the truthful testimony of Brittany Perkins in that proceeding. (Obstructing Justice (Testimony), in violation of D.C.Code Section 22–722(a)(2)(A) (2001 ed.))." In the course of pretrial discovery, the government produced the many letters appellant wrote to Perkins since his arrest in April 2007 and audio recordings of scores of telephone conversations appellant had with Perkins during his fourteen months of pretrial detention.

Appellant filed a motion before trial seeking a bill of particulars on the charge of obstruction of justice. Appellant asserted that he was unable to determine from the letters and telephone calls produced in discovery which statements or other conduct the government would put forth at trial to prove obstruction. Appellant argued that he was entitled to know the government's theory of prosecution; the location, time, and date of the offense; and the manner in which the offense was alleged to have been committed. Appellant subsequently filed a motion to dismiss the obstruction charge, arguing that the government's failure to allege his obstructive conduct with sufficient specificity violated his right to due process.

The trial court addressed appellant's motions shortly before opening statements at trial. The court stated its preliminary view that the indictment and discovery materials together provided appellant sufficient notice of the charge of obstruction of justice. The court nevertheless invited government counsel to provide more specificity on the record.

Government counsel explained that the evidence of obstruction of justice was contained in appellant's letters to Perkins. The prosecutor stated: "Specifically in those letters, there's language to the effect of, 'I know you told the police about the car, that's why you can't go to court.' That is consistent with his [tenor] throughout the letters which is, 'don't talk to the police. If they can ask you, say you know nothing,' which we know is not true. 'And you can't testify in court.' So he is influencing her to not testify against him. That's essentially the obstruction of justice." The prosecutor stated further that the government would not be using any of the jail calls to prove obstruction of justice at trial. The prosecutor made no mention of any evidence of in-person conversations between appellant and Perkins.

The trial court determined that the indictment, as narrowed by the government's proffer, provided sufficient notice to appellant. The court accordingly denied appellant's motions for a formal bill of particulars and for dismissal of the obstruction charge.

The trial court subsequently ruled that only a single passage from one of appellant's letters to Perkins would be admitted at trial. That passage, from a letter dated November 16, 2007, read: "And I know that you told the police about the car and other things. That's why you can't come into the courtroom. But I still love and forgive you. I'm not sure why you told them anything. But I don't understand. But what would Jesus do? It's said and done." The trial court stated that the passage could fairly be interpreted as an effort to persuade Perkins not to testify.

The passage from the letter of November 16, 2007 was admitted in evidence at trial during the direct examination of Perkins. On cross-examination, appellant's counsel suggested to Perkins that appellant was merely telling her in the letter that she could no longer attend hearings in the case because she had spoken to the police and become a witness. Perkins agreed that the letter merely said that she couldn't come into the courtroom, and she stated that she did not interpret the letter as an attempt to dissuade her from testifying. Given Perkins' testimony and the ambiguity of the letter itself, the trial judge stated during a bench conference, outside the presence of the jury, that he was inclined to find the evidence legally insufficient to support a conviction for obstruction of justice.

When cross-examination resumed following the bench conference, however, Perkins stated that at one point appellant told her to say no if the police asked her whether she knew anything. Appellant's counsel followed up: "Let me ask you this, Ms. Perkins. Did he [appellant] at any time ask you to lie to the police?" "Yes," Perkins replied. "He asked you to lie to the police?" "Yes."

Perkins explained these answers on redirect examination by stating that she had information relevant to the case even though she was not an eyewitness to the shooting in Amanuel Market. "So when [appellant] told you [to] tell the police you know nothing," the prosecutor asked, "was he asking you to [tell] the truth or a lie?" "A lie," Perkins answered.

Appellant moved for a judgment of acquittal on the obstruction of justice charge at the conclusion of the government's case-in-chief. The trial judge reiterated his view that no reasonable juror could conclude beyond a reasonable doubt, based on the letter of November 16, 2007, that appellant meant to dissuade Perkins from testifying as a witness in the case. Yet given the testimony appellant's counsel elicited from Perkins on cross-examination, the trial court declined to direct an acquit-

tal on the obstruction charge. The trial court stated: "[L]ike Lazarus, this count may have come back from the dead based upon the cross-examination, because on cross-examination, [Perkins] clearly indicated that [appellant] told her to lie and not to be truthful and not to really tell of everything she knew truthfully to law enforcement."

The prosecutor made no mention of the letter of November 16, 2007 in his closing argument to the jury, relying instead on Perkins' testimony on cross- and redirect examination to support the charge of obstruction of justice. It is clear from the record that the jury's verdict of guilty on that charge is based on Perkins' testimony that appellant told her to lie to the police by saying she knew nothing about the case.

Appellant contends that it was error to allow the obstruction of justice charge to go to the jury on a factual theory materially at variance with the government's pretrial proffer. Appellant concedes, however, that he never raised the issue of prejudicial variance in the trial court and that his claim on appeal is therefore subject to plain error review.

■ Under the plain error doctrine, appellant must establish (1) that the trial court committed error; (2) that the error was "plain," *i.e.*, "clear" or "obvious"; (3) that the error affected substantial rights; and (4) that a failure to correct the error would seriously affect the fairness, integrity, or public reputation of judicial proceedings. *United States v. Olano,* 507 U.S. 725, 732–36, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993). Appellant has not made the requisite showing here.

■ As an initial matter, appellant has not established that the trial court committed a clear or obvious error, or indeed any error at all, in allowing the obstruction of

justice charge to go to the jury on the factual theory elicited by appellant's counsel on cross-examination of Perkins. A variance occurs when the facts proved at trial materially differ from those alleged in the indictment or bill of particulars but the essential elements of the offense remain unchanged. *Roberts v. United States,* 752 A.2d 583, 592 (D.C.2000); *Ingram v. United States,* 592 A.2d 992, 1006 (D.C.1991). If we consider the government's pretrial proffer as the functional equivalent of a bill of particulars, then we agree with appellant that there was a variance between the charging document, as narrowed by the government, and the evidence ultimately relied on at trial to prove obstruction of justice. There is a material difference between a letter telling a witness not to testify in court and an oral communication telling a witness to lie to the police.

■ A variance, however, is impermissible and warrants reversal of a conviction only upon a showing of prejudice. *Pace v. United States,* 705 A.2d 673, 676 (D.C.1998). A variance is prejudicial if it either "deprives the defendant of an adequate opportunity to prepare a defense" or "exposes him to the risk of another prosecution for the same offense." *Zacarias v. United States,* 884 A.2d 83, 87 (D.C.2005).

Appellant asserts on appeal that the variance here prejudiced his ability to defend against the obstruction charge because he had no time to obtain records of his jail visits with Perkins or to conduct other investigation aimed at challenging the reliability of her testimony that he told her to lie to the police about what she knew. This assertion, however, is utterly speculative; even now, it is unsupported by any evidence in the record suggesting that such investigation would have led to the discovery of impeaching information.

More to the point, the determination of whether a variance is prejudicial (and thus prohibited) requires a careful consideration of the extent of the change in factual theories, the sufficiency of the notice previously provided, the degree of surprise to the defendant, and the strength of the defendant's expressed need to investigate and otherwise prepare to meet the force of the different proof being offered by the government. It is a complex analysis that turns on the specific facts and circumstances presented. Here, however, there was no objection in the trial court, no discussion of investigative needs, and no request for a continuance. *See Williams v. United States*, 756 A.2d 380, 389 (D.C.2000) (stating that a defendant's "failure to ask for a continuance may defeat a claim of surprise"). Moreover, the obstruction theory ultimately pursued at trial was not entirely divergent from that proffered by the government before trial. As indicated above, the prosecutor, in making his pretrial proffer, described appellant's letter of November 16, 2007 by stating, in part: "That is consistent with his [tenor] throughout the letters which is, 'don't talk to the police. If they can ask you, say you know nothing,' which we know is not true."

We cannot conclude on this record that the trial court erred in failing, *sua sponte*, to preclude the government from proceeding on evidence that appellant told Perkins to lie if asked by the police whether she knew anything about the case. Certainly nothing in the record before us establishes that the prejudice of which appellant now complains for the first time was in any way "plain" or "obvious" to the trial judge.

Even if appellant had met his burden of demonstrating plain error that affected his substantial rights, we still could not find that a failure to correct the alleged error would seriously affect the fairness, integrity, or public reputation of judicial proceedings. The variance was the direct result of the actions of appellant's own trial counsel, who elicited the evidence underlying the new factual theory of obstruction of justice on cross-examination of Perkins despite the trial court's strong suggestion following Perkins' direct examination that the evidence concerning appellant's letter of November 16, 2007 was legally insufficient to support a conviction. Although the government took full advantage of the actions of appellant's counsel, the sequence of events is inconsistent with the notion that appellant's conviction on the obstruction charge has done damage to the public reputation of judicial proceedings.[1] We find no plain error.[2]

---

1. We state no view as to whether the performance of appellant's trial counsel satisfied constitutional norms.

2. In a related argument, appellant contends that his conviction for obstruction of justice must be reversed and that a judgment of acquittal must be entered because, as the trial court intimated, the evidence was legally insufficient to support a conviction on the theory that appellant sought to persuade Perkins not to testify. We do not see this issue as analytically distinct from the claim of prejudicial variance. Once we acknowledge, as we have, that a variance occurred, the sufficiency of the evidence of the original factual theory becomes irrelevant, and the sufficiency of the evidence must be judged against the factual theory on which the jury based its verdict. In that regard, appellant also argues, for the first time in his reply brief, that the evidence was legally insufficient to support a conviction on the theory that he told Perkins to lie to the police. We decline to reach this claim, as "[i]t is the longstanding policy of this court not to consider arguments raised for the first time in a reply brief." *Stockard v. Moss*, 706 A.2d 561, 566 (D.C.1997) (citing *District of Columbia v. Patterson*, 667 A.2d 1338, 1346 n. 18 (D.C.1995); *Bingham v. Goldberg. Marchesano. Kohlman. Inc.*, 637 A.2d 81, 95 n. 34

## D. Merger of Offenses

Finally, appellant contends that his two convictions for possession of a firearm during a crime of violence merge for double jeopardy purposes because they arise from his possession of a single weapon during a single incident of violence against a single victim. *See Nixon v. United States,* 730 A.2d 145, 153 (D.C.1999). The government conceded this point at oral argument, and we conclude, on the facts presented here, that one of appellant's convictions for possession of a firearm during a crime of violence must be vacated on remand. *Cf. Hanna v. United States,* 666 A.2d 845, 854–55 n. 12 (D.C.1995) (allowing multiple convictions for possession of a firearm during a crime of violence to stand where each count arose from the commission of "an independent violent crime" based on "a fresh impulse").

### III.

For the foregoing reasons, the case is remanded to the trial court with instructions to vacate one of appellant's convictions for possession of a firearm during a crime of violence. The judgment of the Superior Court is otherwise affirmed.

*So ordered.*

(D.C.1994)); *accord Comford v. United States,* 947 A.2d 1181, 1188 (D.C.2008).